[No. H025036. Sixth Dist. Dec. 19, 2003.]

THE PEOPLE, Plaintiff and Appellant, v.
HOLLY SWANSON-BIRABENT, Defendant and Respondent.

**COUNSEL**

George W. Kennedy, District Attorney, and Judith B. Sklar, Deputy District Attorney, for Plaintiff and Appellant.

Steven R. Pogue for Defendant and Respondent.

OPINION

**BAMATTRE-MANOUKIAN, J.**—The People appeal from the trial court's order granting defendant Holly Swanson-Birabent's Penal Code section 995 motion to dismiss two counts of committing a lewd or lascivious act on a child under the age of 14 (Pen. Code, § 288, subd. (a)).[1] The actual acts were perpetrated by one Don Umble. Defendant is the victim's mother; she was charged as an aider and abettor.

The People contend that the trial court erred by dismissing the charges against defendant. We agree that the evidence presented at the preliminary hearing provided the basis for a reasonable suspicion that defendant aided and abetted Umble. We will therefore reverse the trial court's order dismissing both charges.

## I. BACKGROUND

On June 12, 2002, a felony complaint was filed, charging defendant and Don Umble with two counts of committing a lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a)).

A preliminary hearing was held on July 12, 2002. The victim was the only witness. At the time, the victim was 13 years old and in the ninth grade. She was living in the state of Washington with her father and stepmother.

Both alleged incidents of molestation occurred during the year the victim was in kindergarten, when she was four or five years old. During that year, the victim lived primarily with defendant in San Jose. The victim's father lived in Montana. After kindergarten, the victim lived primarily with her father; she saw defendant only during the summers, every other Christmas, and every other spring break.

During the year that the victim lived with defendant, Umble was defendant's boyfriend. He did not live with defendant and the victim, but he "would come over and spend significant amounts of time including overnight."

The first incident occurred in defendant's bedroom. It was nighttime, and there were no lights on in the bedroom or the hallway of the apartment: "It was dark." However, lighting was provided by streetlights outside of the bedroom.

The victim had been asleep in her own bedroom. She woke up at some point during the night and walked into defendant's bedroom. She was

---

[1] Unspecified section references are to the Penal Code.

wearing only a T-shirt. It was common for the victim to wake up at night and go sleep with defendant. There was no testimony as to whether or not it was common for Umble to be in the bed as well.

When the victim entered the bedroom, she observed defendant "giving oral sex" to Umble. The victim lay down in the bed, got underneath a sheet and went to sleep. At some point, Umble got into bed with the victim, beneath the sheet. The victim did not know how much time had passed between the time she fell asleep and the time Umble got into bed with her. "[H]e woke me up and then he touched me." Specifically, Umble touched the victim "in the private area," putting his finger inside her vagina. He moved his finger around "a little bit." The victim did not recall how Umble woke her up.

During the incident, defendant was "standing on the other side of the bed." Asked what defendant was doing while Umble was touching her, the victim initially testified, "I guess, watching." Later, she testified that defendant was "[w]atching." The victim did not provide any further details as to what defendant was doing. Asked whether defendant was aware of what Umble was doing, the victim asserted, "Yes." "She was aware." Asked how she could know that, the victim responded, "Because she was there." "Any person who was there would be able to figure out what he was doing."

After Umble touched the victim, defendant got into the bed. The victim then got out of the bed and went back to her own bedroom. The victim did not discuss the incident with defendant.

A second incident occurred on a night when the victim, defendant, and Umble went to see a movie. The victim fell asleep in the car on the way home. The victim woke up while Umble was carrying her into the house. Umble placed the victim in defendant's bed. Defendant followed them into the bedroom. At some point, the victim fell back asleep. "Then he woke me up, and it happened again." "He stuck his finger up my vagina." Again, Umble moved his finger around "a little bit." The victim did not move. She could not recall whether she and Umble were under the covers.

During the second incident, the lighting was the same as during the first incident: it was dark; but the outside streetlights provided light. "You could see larger objects, not intricate little things."

During this incident, defendant was again "[s]tanding on the other side of the bed." The victim "saw glimpses of her" while Umble was touching her. Defendant "was just standing there watching." The victim testified that she believed defendant was aware of what Umble was doing: "I think she was aware of it, because any person would be able to figure [it] out unless you're extremely stupid that something sexual was occurring."

After Umble stopped touching her, the victim fell back asleep. Again, the victim failed to tell defendant what had happened, because she was "scared of the situation," and "embarrassed also."

The first time that the victim told someone about these incidents was when she was in either fourth grade or sixth grade. At that time, she told her best friend. In January of 2002 (approximately nine years after the incidents), the victim told a counselor about what had happened. In February of 2002, the victim told her father. The victim did not explain her delayed disclosure.

At the end of the preliminary hearing, defendant argued that there was no evidence to indicate that she aided or abetted Umble. Counsel argued: "[T]here is no evidence to indicate that [defendant] aided or abetted Mr. Umble in what he did, and on speculating based on presence in a darkened room that [defendant] should have realized what was going on in the first incident under a bedsheet in a darkened room, and in the second incident without remembering whether there were covers over the participants or not in a darkened room."

The People argued that "this is a different case than a normal aiding and abetting, because of the fact that the defendant was, in fact, the victim's mother, and as a result, she had a responsibility to her child that a normal independent citizen or witness would not and her failure to act and, in fact, her affirmative steps of remaining in the room and getting in the bed with [Umble] and [the] victim crossed the threshold for aiding and abetting."

The magistrate held defendant to answer, finding "it's a close question . . . , but I think, for the purposes of preliminary examination, and in the context of the circumstances that have been alleged, there is enough to draw the inference that there was an aiding and abetting, found in CALJIC, based on the sexual encounter of oral copulating Mr. Umble first, and then the subsequent conduct by Mr. Umble to the victim. [¶] And from that, I draw the inference[] that it was a similar situation in the second incident as a result as the first incident."

On July 18, 2002, an information was filed, charging defendant and Umble with two counts of committing a lewd or lascivious act on a child under the age of 14. (§ 288, subd. (a).) The information alleged that Umble had substantial sexual conduct with the victim (§ 1203.066, subd. (a)(8)), and that he had two prior serious felony convictions (§ 667, subd. (a)), both for violating section 288, subdivision (a).

On July 24, 2002, defendant filed a motion to set aside the information (§ 995). Again, she argued that the evidence only established her presence

during the molestations and that the victim had merely speculated that defendant knew what was happening. Defendant argued that the existence of a "special relationship" with the victim did not change the requirements for aiding and abetting.

On August 5, 2002, the People filed their opposition to defendant's motion to dismiss. The People argued that the victim's testimony provided probable cause to believe that defendant knew what Umble was doing. Relying on out-of-state cases, the People argued that defendant's failure to act, coupled with her knowledge, provided probable cause to believe that defendant aided and abetted Umble.

Defendant's motion to dismiss was heard on August 9, 2002. The trial court noted that the magistrate had "tacitly found that [defendant] was watching the situation." The trial court further noted that during both incidents, "the touching was the only thing that happened," that it was "brief," and that defendant said nothing. The trial court stated that "the general rule is that mere presence at the scene of the crime" is insufficient to establish aiding and abetting liability, but that the People believed "that an exception should be carved out."

The trial court noted that in the cases cited by the People where courts had found aiding and abetting liability, "it's an ongoing thing . . . there's room for the defendant to step in and say 'don't do that.' " The trial court contrasted the instant case: "I don't even think there's enough to suspect that the defendant could have even stepped in time to stop it because it was done so quickly." The trial court ultimately found that there was no "continuing obvious course of action, either sexual or physical danger against a child where the mother could clearly step in," and refused to hold defendant to answer.

On September 9, 2002, the People filed a notice of appeal.

## II.  DISCUSSION

### A.  *Standard of Review*

To prevail on a motion to dismiss under section 995, "a defendant must show that, in light of the evidence presented to the grand jury or . . . magistrate, he or she was indicted or committed 'without reasonable or probable cause' to believe that he or she was guilty of [the offense]. ' " 'Reasonable or probable cause' means such a state of facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused. 'Reasonable and

probable cause' may exist although there may be some room for doubt." ' [Citations.]" (*People v. Mower* (2002) 28 Cal.4th 457, 473 [122 Cal.Rptr.2d 326, 49 P.3d 1067].)

" 'On a motion to set aside an information, the question of the guilt or innocence of the defendant is not before the court, nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. The court is only to determine whether the magistrate, acting as a [person] of ordinary caution or prudence, could conscientiously entertain a reasonable suspicion that a public offense had been committed in which the defendant had participated.' [Citation.] Neither the trial court in a section 995 proceeding [citations] nor a reviewing court on appeal therefrom [citations] may substitute its judgment as to the weight of the evidence for that of the committing magistrate. 'Although the magistrate, in reaching his [or her] decision, may weigh the evidence, resolve conflicts, and give or withhold credence to witnesses, such a balancing of the evidence is not within the powers of a tribunal reviewing the magistrate's order.' [Citation.] Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information. [Citation.]" (*People v. Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664].)

" ' "On review by appeal or writ . . . the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer." ' [Citations.] The standard for review is as follows: ' "To support a felony information, there need be only 'some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it' [citation], and an information will not be set aside or a prosecution prohibited thereon if this standard is met." ' [Citation.] However, where the facts are undisputed, the determination of probable cause 'constitute[s] a legal conclusion which is subject to independent review on appeal.' [Citation.]" (*People v. Superior Court (Bell)* (2002) 99 Cal.App.4th 1334, 1339 [121 Cal.Rptr.2d 836].)

### B. *Aiding and Abetting*

■ A person who aids and abets the commission of a criminal offense is considered a principal in the crime. (§ 31.) In order for criminal liability to be imposed under an aiding and abetting theory, the person must "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" (*People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].)

## 1. Knowledge

We first address the question whether there was any evidence that defendant had "knowledge of the criminal purpose of the perpetrator." (*People v. Beeman, supra,* 35 Cal.3d at p. 560.) The People argue that the victim's testimony provided a sufficient basis for an inference that defendant knew that Umble was molesting the victim. Defendant argues there was no evidence to show that defendant knew what Umble was doing.[2]

The victim testified that during both incidents, defendant was "watching" from the far side of the bed. Although during both incidents, the room was dark, the victim believed that defendant was aware of what Umble was doing. Indeed, the fact that defendant stood by, doing and saying nothing, while Umble molested her daughter, supports an inference that she knew what was happening.

Defendant herself acknowledges that the evidence adduced at the preliminary hearing could support three different scenarios: (1) "Defendant stood by approvingly as [Umble] violated her child, fully aware of what he was doing"; (2) "Defendant stood by in shocked horror, stunned and unable to react, as her child was molested, fully aware of what was occurring"; or (3) "Defendant stood in a darkened room while [Umble] furtively molested her child, and she was unaware that it was occurring."

Defendant concedes that "[a]ny of the above theories could be found from the evidence," but argues that "no one could find beyond a reasonable doubt that Defendant knew what was going on." However, the magistrate did not need to find that defendant had knowledge of what Umble was doing beyond a reasonable doubt. The magistrate merely had to find reasonable and probable cause to believe defendant had such knowledge. In making such a finding, the magistrate was entitled to draw every legitimate inference in favor of the information.

Here, the magistrate could infer defendant's knowledge based on the victim's testimony regarding the first incident. The victim testified that defendant was "watching" as Umble got into the bed and molested her. Defendant stood right by the bed, doing nothing else, during the incident. Defendant did not get into the bed until after the molestation was over. The fact that the room was dark and that the molestation occurred underneath a sheet does not render the victim's testimony unbelievable. A bed sheet is thin enough to reveal that acts are occurring underneath it, and there were lights

---

[2] As the trial court noted, the magistrate "tacitly found that [defendant] was watching the situation." By finding that defendant had no time to stop the molestation, the trial court apparently agreed that there was sufficient evidence of defendant's knowledge.

shining through the bedroom window. The magistrate could reasonably infer that defendant had knowledge that Umble was touching the victim in the vaginal area under the sheet.

The magistrate could also infer defendant's knowledge based on the victim's testimony regarding the second incident. The victim testified that the conditions were exactly the same as during the first incident, although she could not recall whether the molestation occurred over or under a sheet or blanket. As in the first incident, defendant stood by, watching, as Umble molested the victim.

Defendant argues that in order for her to be liable as an aider and abettor, she must have had knowledge of the fact that Umble planned to molest the victim *before* he actually began molesting her. Defendant contends that there was no evidence she had such advance knowledge.

■ Contrary to defendant's assertion, advance knowledge is *not* a prerequisite for liability as an aider and abettor. "Aiding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself. [Citation.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 532 [26 Cal.Rptr.2d 323].) In *People v. Cooper* (1991) 53 Cal.3d 1158 [282 Cal.Rptr. 450, 811 P.2d 742] (*Cooper*), the court held that "a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during such asportation, may properly be found liable as an aider and abettor of the robbery." (*Id.* at p. 1161.) The court reasoned that "the commission of robbery continues so long as the loot is being carried away to a place of temporary safety." (*Id.* at p. 1170; see also *People v. Montoya* (1994) 7 Cal.4th 1027, 1039 [31 Cal.Rptr.2d 128, 874 P.2d 903] [upholding burglary conviction for aider and abettor who did not have knowledge of criminal purpose until after entry].)

In *Cooper*, the court commented: "The logic of viewing 'committed' as a fixed point in time for purposes of guilt-establishment and 'commission' as a temporal continuum for purposes of determining accomplice liability can be seen from the perspectives of both the victim and the accomplice. The rape victim, for example, would not agree that the crime was completed once the crime was initially committed (i.e., at the point of initial penetration). Rather, the offense does not end until all of the acts that constitute the rape have ceased. Furthermore, the unknowing defendant who happens on the scene of a rape after the rape has been initially *committed* and aids the perpetrator in the continuing criminal acts is an accomplice under this concept of 'commission,' because he formed his intent to facilitate the commission of the rape *during its commission*." (*Cooper, supra,* 53 Cal.3d at p. 1165, fn. 7.)

Defendant relies on *Pinell v. Superior Court* (1965) 232 Cal.App.2d 284, 288–289 [42 Cal.Rptr. 676] (*Pinell*). In that case, the victim was raped by two codefendants while defendant Pinell was asleep in another room. Pinell refused to have sex with the victim when one of the codefendants brought her into his bedroom and pushed her towards him. The trial court denied Pinell's section 995 motion to dismiss charges of rape, robbery, oral copulation and sodomy, all of which were based on the theory that he had aided and abetted the codefendants. The Court of Appeal reversed, noting that there was "no testimony that [the victim] said or did anything that would make [Pinell] aware of her predicament before he actually saw her in his bedroom." (*Id.* at p. 288.) The court contrasted the facts of the case with other cases in which the accused aider and abettor had "full knowledge" that a crime was being committed by others. (*Ibid.*)

■ The *Pinell* case is distinguishable. Here, the victim testified that defendant was "watching" the molestation. Defendant was not in another room, asleep. She was standing directly beside the bed where the molestation was occurring. She was not engaged in any activity that might have prevented her from noticing that Umble was in bed with her four- or five-year-old daughter, under a bed sheet, touching her in the vaginal area. The evidence was sufficient to support a finding that defendant's knowledge of Umble's actions and intent arose sometime during the commission of the molestation. Under the rationale of *Cooper*, this would be sufficient to support the magistrate's finding of reasonable and probable cause to believe that defendant had the requisite "knowledge of the criminal purpose of the perpetrator." (*People v. Beeman, supra,* 35 Cal.3d at p. 560.)

## 2. Failure to Act

We next address the question whether liability as an aider and abettor may be premised on a defendant's failure to act. As noted above, in order for criminal liability to be imposed under an aiding and abetting theory, the person must "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" (*People v. Beeman, supra,* 35 Cal.3d at p. 560.) Defendant argues that she did not "act" and therefore cannot be liable as an aider and abettor.

■ The "act" required for aiding and abetting liability need not be a substantial factor in the offense. " 'Liability attaches to anyone "concerned," however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal.' [Citation.]" (*People v. Durham* (1969) 70 Cal.2d 171, 185, fn. 11 [74 Cal.Rptr. 262, 449 P.2d 198].) "It has been held, therefore, that one who is present for the purpose of diverting

suspicion, or to serve as a lookout, or to give warning of anyone seeking to interfere, or to take charge of an automobile and to keep the engine running, or to drive the 'getaway' car and to give direct aid to others in making their escape from the scene of the crime, is a principal in the crime committed. [Citations.]" (*People v. Masters* (1963) 219 Cal.App.2d 672, 680 [33 Cal.Rptr. 383].)

The People argue that during the first incident, defendant's act was to "allow her daughter to be substituted for herself as Umble['s] sexual partner." Our review of the record indicates that the victim did not know how much time passed between the oral copulation and the molestation. The victim testified, "I fell asleep, and he woke me up, and then he did that to me."

However, the magistrate could reasonably determine that defendant did "act" during each incident, by standing over the bed and watching as Umble molested the victim. Defendant argues that this was not an "act," citing the rule that, ordinarily, mere presence at the scene of a crime and the failure to take steps to prevent a crime are insufficient to establish aiding and abetting liability. (See *People v. Culuko* (2000) 78 Cal.App.4th 307, 331 [92 Cal.Rptr.2d 789].) However, in this case defendant was not *merely* present. Her presence served an important purpose: it encouraged the victim to comply with Umble rather than resist. Defendant's presence also encouraged Umble to continue molesting the victim.

Our analysis is reflected in the language of the standard jury instruction on the principles of aiding and abetting liability. CALJIC No. 3.01 states: "Mere presence at the scene of a crime *which does not itself assist the commission of the crime* does not amount to aiding and abetting."[3] (Italics added.) Here, the magistrate could reasonably find that defendant's presence, in itself, assisted Umble's commission of a lewd act on the victim.

Our analysis would be the same even if we were to classify defendant's act of standing over the bed, watching Umble molest the victim, as an "omission" rather than an "act." Although no published California case has yet to consider the question, other "state courts have held that a failure to act can constitute aiding and abetting, provided the aider and abettor has a legal duty to act. [Citations.]" (*People v. Culuko, supra,* 78 Cal.App.4th at p. 331, fn. 7.)

---

[3] CALJIC No. 3.01 provides in full: "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] [A person who aids and abets the [commission] [or] [attempted commission] of a crime need not be present at the scene of the crime.] [¶] [Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.] [¶] [Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.]"

The most analogous out-of-state case cited by the People is *State v. Ainsworth* (1993) 109 N.C. App. 136 [426 S.E.2d 410], where the defendant watched another woman have sex with the defendant's son. She "failed to take any steps to prevent the attack on her child. Indeed, . . . the defendant lay on the same bed as the one in which her twelve year old child was being raped without uttering a single word in his defense. Moreover, at that time there did not appear to be any danger to the defendant." (*Id.* at p. 415.) The defendant brought a motion to dismiss charges of first degree rape and "indecent liberties," which were based on an aiding and abetting theory. (*Id.* at p. 414.) The trial court refused to dismiss the charges, and the North Carolina Court of Appeals affirmed.

The *Ainsworth* court relied primarily on the North Carolina Supreme Court's prior decision in *State v. Walden* (1982) 306 N.C. 466 [293 S.E.2d 780]. In *Walden*, the defendant watched as her small child was physically abused. The court concluded that the defendant could be held criminally liable for assault, as an aider and abettor, based on her presence and failure to take reasonable steps to prevent the assault: "[W]e believe that to require a parent as a matter of law to take affirmative action to prevent harm to his or her child or be held criminally liable imposes a reasonable duty upon the parent. Further we believe this duty is and has always been inherent in the duty of parents to provide for the safety and welfare of their children, which duty has long been recognized by the common law and by statute. [Citation.] This is not to say that parents have the legal duty to place themselves in danger of death or great bodily harm in coming to the aid of their children. To require such, would require every parent to exhibit courage and heroism which, although commendable in the extreme, cannot realistically be expected or required of all people. But parents do have the duty to take every step reasonably possible under the circumstances of a given situation to prevent harm to their children. [¶] In some cases, depending upon the size and vitality of the parties involved, it might be reasonable to expect a parent to physically intervene and restrain the person attempting to injure the child. In other circumstances, it will be reasonable for a parent to go for help or to merely verbally protest an attack upon the child. What is reasonable in any given case will be a question for the jury after proper instructions from the trial court. [¶] . . . It remains the law that one may not be found to be an aider or abettor, and thus guilty as a principal, solely because he [or she] is present when a crime is committed. [Citation.] It will still be necessary, in order to have that effect, that it be shown that the defendant said or did something showing his [or her] consent to the criminal purpose and contribution to its execution. [Citation.] But we hold that the failure of a parent who is present to take all steps reasonably possible to protect the parent's child from an attack by another person constitutes an act of omission by the parent showing the parent's consent and contribution to the crime being committed."

(*Walden, supra,* at pp. 786–787; see also *People v. Stanciel* (1992) 153 Ill.2d 218 [606 N.E.2d 1201, 1211, 180 Ill.Dec. 124] [in light of common law duty of parents to protect their children, defendants could be liable for their childrens' murders, as aiders and abettors, based on their failure to protect the children from abusive boyfriends].)

■ In California, parents have a duty "to exercise reasonable care, supervision, protection, and control over their minor child[ren]." (§ 272, subd. (a)(2).) As the victim's mother, defendant clearly had a duty to protect the victim from molestation by Umble. Instead of attempting to stop him by words or actions, she stood by and watched as he committed a lewd act on the victim. In failing to act, she both encouraged the victim to comply with Umble rather than resist, and she encouraged Umble to continue molesting the victim.

■ The evidence presented at the preliminary hearing provided a " 'rational ground for assuming the possibility' " that defendant aided and abetted Umble. (*People v. Superior Court (Bell), supra,* 99 Cal.App.4th at p. 1339.) Therefore, we conclude that the trial court erred by granting defendant's section 995 motion to dismiss the two charges of violating section 288, subdivision (a).

### III. DISPOSITION

The order dismissing the charges against defendant Holly Swanson-Birabent is reversed. The information charging defendant Holly Swanson-Birabent with two counts of violating section 288, subdivision (a) shall be reinstated.

Premo, Acting P. J., and Elia, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 17, 2004.