Filed 3/17/15  P. v. Johnson CA5

NOT TO BE PUBLISHED IN THE OFFICAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAMES WILLIS JOHNSON,<br><br>    Defendant and Appellant. | F067359<br><br>(Super. Ct. No. BF134515)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Alice Su, Deputy Attorneys General for Plaintiff and Respondent.

-ooOoo-

James Willis Johnson was convicted of the second degree murder of his infant son. He was also found guilty of assault on a child resulting in death, child endangerment, and resisting arrest.  He now argues that the trial court abused its discretion when it denied his

motion for a new trial and his petition pursuant to Code of Civil Procedure section 237 for disclosure of juror identifying information to be used to develop support for a motion for a new trial. He also contends that the trial court gave an erroneous answer to a question the jury asked about the elements of aiding and abetting.

We agree with the contention that the court abused its discretion when it denied the petition for juror identifying information. The court was informed that a juror claimed jurors had discussed Johnson's failure to testify, contrary to the court's instructions. We will conditionally affirm the judgment and remand with directions to proceed in accordance with Code of Civil Procedure section 237.

## *FACTS AND PROCEDURAL HISTORY*

Denise Belmonte was Johnson's partner and the mother of his three children. The third child, a boy named Jordan, was the victim in this case. He was born on October 6, 2010, and was just over a month old when he died.

Belmonte called 911 around 9:20 a.m. on November 10, 2010. A paramedic who responded found Belmonte on the floor administering CPR to Jordan. No one else was in the room. Jordan was not breathing and had no pulse. The paramedic observed rigor mortis in Jordan's jaw when he attempted to place a breathing tube. He concluded that Jordan was dead.

Jordan was taken to an emergency room, where he was declared dead at 9:45 a.m. An emergency room doctor believed Jordan died earlier than 8:30 p.m. the previous night. An autopsy found the cause of death to be multiple blunt force injuries. Both arms, both legs, and two ribs were fractured. The liver was lacerated and bled internally; this was probably the predominant injury. The brain was swollen and there was bleeding inside the skull. These injuries were consistent with Jordan having been punched or having collided with a solid object after being thrown. There were at least two blows, one to the front of the abdomen on the right side and one on the back left.

2.

There also were burns, which appeared to predate the other injuries, as they had become infected and had started to turn green. These were third-degree burns covering Jordan's buttocks and genitalia and his lower abdomen. They were caused by contact with a liquid at a temperature of 140 degrees or more for no more than 45 seconds.

Hypovolemic shock, which is a kind of circulatory collapse, was caused by the bleeding from the internal injuries, as well as by the burns, and led to death. The pathologist who conducted the autopsy concluded that the manner of death was homicide. Jordan's blood tested positive for THC and acetaminophen.

The district attorney filed an information against Johnson and Belmonte. It charged both defendants with three counts: (1) premeditated murder (Pen. Code, § 187, subd. (a));[1] (2) assault on a child under age eight with force likely to produce great bodily injury and resulting in death (§ 273ab); and (3) willfully causing or permitting a child to suffer unjustifiable physical pain or mental suffering, under circumstances likely to produce great bodily injury or death (§ 273a, subd. (a)). In connection with count 3, the information alleged for sentence-enhancement purposes that Johnson and Belmonte each personally inflicted great bodily injury on Jordan. (§ 12022.7, subd. (d).) The information charged Johnson alone with resisting arrest, a misdemeanor. (§ 148, subd. (a)(1).)

Belmonte entered into a plea agreement. In exchange for her testimony against Johnson and her plea of guilty to child endangerment and voluntary manslaughter, Belmonte received a determinate prison term of 15 years.

Belmonte was the prosecution's primary witness at trial. She testified that she met Johnson in 2005, when she was 16 and Johnson was 26. Johnson already had a son. Their first child together, Ja., was born in 2008 and their second, J., in 2009.

---

[1]Subsequent statutory references are to the Penal Code unless noted otherwise.

Belmonte testified that Johnson was physically abusive to her throughout their relationship. She also testified that she had no bond with J. because he was a boy; she said her mother favored boys and she wanted to do the opposite. County authorities removed both children from the parents' custody.

Belmonte regained custody of Ja. in September 2010, after falsely assuring the social worker that she was separated from Johnson and living on her own in a motel. Before giving birth to Jordan in October 2010, Belmonte admitted she was not really living at the motel, and she gave Ja. to the social worker to be placed with J. Belmonte and Johnson convinced the social worker that Belmonte would be living with Johnson's mother after Jordan was born, however, so Ja. was returned to Belmonte when she left the hospital with Jordan. Immediately after this, Belmonte and Johnson resumed living together.

Belmonte testified about Johnson's behavior toward Jordan during the month Jordan lived. She found recordings Johnson had made with his phone of speeches Johnson made to Jordan. In these recordings, Johnson spoke to Jordan in an adult manner about adult subjects, such as growing marijuana. Johnson also took Jordan to a room in the apartment where marijuana was grown and tried to show Jordan how to grow it. He tried to show Jordan how to box. He pushed Jordan's legs up so his feet touched his head, trying to make Jordan more flexible. Johnson held Jordan upside down by the legs and swung his body. He swaddled Jordan improperly. Sometimes Johnson swaddled Jordan in such a way as to hold Jordan's pacifier in mouth, because Johnson did not like it when Jordan spit the pacifier out. Other times, Johnson swaddled Jordan so that Jordan's arms were behind his back. Belmonte told Johnson not to do these things, and Johnson said he would do whatever he wanted if he really was Jordan's father. During Jordan's life and Belmonte's pregnancy with Jordan, Johnson often expressed doubt about whether he was Jordan's father, sometimes leading to physical abuse of Belmonte.

According to Belmonte's testimony, Jordan sustained the burns on his lower body on November 3, 2010, a week before his death. That night, Belmonte, Johnson, and Ja. were in their living room playing a video game when Jordan's diaper needed to be changed. Johnson took Jordan to the bathroom to rinse him off. Belmonte and Johnson sometimes used baby wipes when changing Jordan, but other times they washed him off in the sink. While Johnson and Jordan were in the bathroom, Belmonte heard Jordan cry, but this was not unusual, since Jordan did not like water. When Johnson came back with Jordan, however, he was "frantic" and said he had burned Jordan. Belmonte could see that Jordan's buttocks and genitals had been burned; they were bright red.

Belmonte wanted to take Jordan to the doctor, but Johnson said they would lose the kids, he would go to jail, and he would kill her. They argued, and Johnson hit Belmonte.

They decided to go to a store to get something to treat the burns. They went to a Walgreens and got some ointment, which they applied over the next few days. Jordan cried when anything touched the burns, and after a day or two they turned brown and then green. Belmonte gave Jordan Tylenol or Motrin for pain, and she saw Johnson rub Vicodin on Jordan's gums. She also saw Johnson blowing marijuana smoke into Jordan's mouth. Belmonte never sought medical treatment for Jordan because Johnson would not allow her to do so, though she asked many times.

Belmonte testified that on November 9, 2010, the night before the morning on which Jordan was found dead, Jordan was quieter than usual and was moaning even when no one was touching him. They had argued over the cost of diapers that day, and Johnson had hit Belmonte several times and deliberately broken her cell phone. After they had run several errands and eaten dinner, Belmonte was going to go out to another store. Johnson became angry and said Belmonte could not leave. He grabbed her hair, punched her, and pushed her into the bedroom. In the bedroom, Johnson choked Belmonte until she was unconscious.

5.

When Belmonte regained consciousness, Ja. was on top of her. Belmonte heard Jordan crying. She went into the living room and saw Johnson with Jordan. Johnson was holding Jordan upside down by one leg. Belmonte tried to take Jordan from Johnson. Johnson "swung Jordan backward and threw him on the bed." Jordan hit a couch and landed on a bed beside it. Belmonte went toward Jordan, but Johnson picked him up first. Johnson and Belmonte had a tug-of-war over a blanket. Johnson got the blanket and wrapped Jordan in it. Belmonte tried to grab Jordan. Johnson said Jordan would not shut up and punched him in the chest. Johnson also attacked Belmonte and tried to choke her again. Jordan cried after being punched, but then became quiet. Johnson put Jordan in a car seat. Belmonte touched Jordan and saw that he was breathing. Belmonte and Johnson continued arguing for a while and then fell asleep some time after midnight. Belmonte woke up and checked on Jordan once during the night. She offered him a bottle, but he did not wake up. She took Jordan's temperature and found it to be 93.1, which she thought was normal.

Belmonte and Johnson woke up in the morning, and after a while, Johnson checked on Jordan and found he was nonresponsive. Belmonte washed Jordan and put clean clothes on him. Johnson and Belmonte argued about whether Jordan was breathing. Jordan continued to be nonresponsive and Belmonte called 911. She administered CPR until the ambulance came. Johnson took Ja. into the bedroom and did not come out while the emergency personnel were present. Belmonte went to the hospital with Jordan in the ambulance.

At the hospital, medical staff told Belmonte Jordan was dead. Belmonte sent Johnson a text message and spoke to him by phone, telling him to come to the hospital. He did not come until after Belmonte had left. Belmonte was arrested the same day.

Belmonte testified that she exchanged letters with Johnson while they both were incarcerated after Jordan's death. She said, "[In one] of the first letters I got he asked me to take the case for him or he would take it all the way to the box." She admitted that, in

6.

one of her letters to Johnson, she graphically described their sex life. She testified that she was going to see him soon when she wrote the letter and did it to discourage him from threatening her as he had done at a previous court appearance.

Belmonte denied that she hurt Jordan or did anything to assault him physically.

On cross-examination, Belmonte was impeached with a juvenile adjudication for petty theft, a conviction of using stolen credit cards, a conviction of writing checks with insufficient funds, and several lies she told to county child welfare officials. She also admitted that, after she was arrested, she made false statements to police about the apparent severity of Jordan's burns, the steps she took in response to the burns, and her living arrangements. Further, she admitted she was "involved in a tax scam" while in custody.

David Nelson, a paramedic who responded to Belmonte's 911 call, testified that when he arrived, Belmonte was "distraught" and did not give a "straight answer" when he asked what happened to Jordan. Fire Captain Basil Rios testified that when he came to the scene, Belmonte was screaming and did not give complete answers to his questions about what happened to Jordan.

Terri Haynes, a police officer, testified that she was at the hospital with Belmonte after Jordan was declared dead. Belmonte asked Haynes whether Haynes thought Jordan died of sudden infant death syndrome. Contrary to Nelson's testimony, Haynes testified that the paramedics told her Belmonte did not seem upset when they contacted her at the apartment. Haynes also said she did not recall Belmonte showing emotion at the hospital. But Haynes's partner, Molly Hessler, testified that she also was present at the hospital and that Belmonte appeared traumatized when Jordan was declared dead.

Detective Martin Heredia testified that he arrested Belmonte and interviewed her a number of times. He spent about four hours with her. During the interview, Belmonte initially said she did not live in the apartment. She never told Heredia that Johnson threw or punched Jordan. She did not even admit that Johnson was present when Jordan was

7.

injured until one of the later interviews. At some point during Heredia's questioning, however, Belmonte did blame Johnson for the injuries and burns that caused Jordan's death.

In September and October 2012, almost two years after Jordan's death, Belmonte was interviewed four times by Patricia Poeschel, an investigator with the district attorney's office. Poeschel testified that at first, Belmonte did not say Johnson threw or punched Jordan and did not mention any argument or fight she had had with Johnson. Poeschel repeatedly told Belmonte she did not believe Belmonte was telling the whole truth. Belmonte told Poeschel she did not know about Jordan's broken bones. Poeschel showed Belmonte x-ray pictures revealing the broken bones. It was after this that Belmonte first said Johnson threw and punched Jordan. Two of the interviews were recorded. A portion of the recording was played for the jury and a transcript was provided. Poeschel also testified that neither she nor the prosecutor ever threatened to take Belmonte's plea deal away because they did not believe she was telling the whole truth.

In the partial transcript of the interviews that is included in the appellate record, Poeschel tells Belmonte she thinks Belmonte might be hiding some of the facts to deny her own responsibility. She also says Belmonte is protecting Johnson. Poeschel further suggests that Belmonte knew Jordan had been hurt on the night he died, but then she left the apartment, smoked marijuana and got drunk. Poeschel claims to have spoken to inmate witnesses who supported this account. Belmonte says she has been threatened and believes that if she provides information that will result in a life sentence for Johnson, Johnson will cause her to be attacked or killed while in prison. Then she cries and begins giving an account similar to the account in her testimony, starting with the time when she re-enters the living room after being assaulted by Johnson in the bedroom and sees Johnson holding Jordan upside down by one foot.

8.

Lonnie Richardson, a neighbor of Belmonte and Johnson, testified that, in October 2010, she heard an argument between them through the wall. She heard Johnson say, "Be the mother and get your [ass] in here and take care of him before I beat the hell out of him."

Nada Yorke, a social worker, testified for the prosecution as an expert on battered women's syndrome (or intimate partner battering syndrome, as it also is called). Among other things, Yorke said that abused people often lie to conceal their situations from child welfare authorities in an effort to keep their children out of foster care, especially if they were placed in foster care as children themselves, as Belmonte was. Yorke also said that the cycle of abuse can continue even when one or both parties to an abusive relationship are in prison.

A police officer testified that the temperature of the running water in the apartment was checked. The hot water in the kitchen and the bathroom reached 148 degrees within two minutes of being turned on. The hot water heater was set on high.

The defense called a witness who was sworn in as Allen Ladsky. He said he was in jail in January 2011 in a cell next to Johnson's cell, when he overheard a conversation between Johnson and Belmonte. He heard Belmonte tell Johnson "something like even if—no matter what, even though I did [it], we're both going to go down for it, or something of that sort." Ladsky testified that he was present in court against his will and believed Belmonte would use gang associates to retaliate against him. The court had to order Ladsky to testify, telling him that if it ruled him in contempt, it could keep him in custody until the end of the trial, which was scheduled to last nearly three more weeks.

An investigator named Daniel Stevenson with the district attorney's office testified that Ladsky told him he fabricated the story about overhearing a conversation between Johnson and Belmonte. Ladsky said he did this at Johnson's request. Stevenson said Ladsky made this statement after Stevenson told Ladsky that Stevenson could "go to bat" for Ladsky. Ladsky testified that he did indeed tell Stevenson he fabricated the story; this

was a lie; and he told Stevenson the lie hoping it would cause Johnson's counsel not to call Ladsky as a witness at trial so he could avoid testifying and facing retaliation.

Ladsky was impeached with prior convictions of falsely identifying himself to police, possessing drugs for sale, resisting arrest, and possessing stolen property. He also said he was a former member of a white supremacist gang, he had a swastika tattooed on his arm, and Allen Ladsky was not his real name. Ladsky testified that he saw Belmonte's face and could pick her out of a lineup, but Stevenson testified that he showed Ladsky a photo lineup including Belmonte, and Ladsky could not identify her.

The defense called Juan Garza, an investigator with the public defender's office, who testified that he spoke with Nelson, the paramedic, in 2012. At that time, Nelson recalled that, when he responded to Belmonte's 911 call, Belmonte acted suspicious. She seemed nervous, her account of events did not make sense, and she was not upset or crying.

Detective Heredia, called back as a defense witness, testified that when he interviewed Belmonte shortly after Jordan's death, Belmonte did not mention that Johnson assaulted her the night before. Heredia did not see any signs of injury on Belmonte.

Finally, Jeff Cameron, a deputy coroner, testified for the defense that he saw and touched Jordan the morning Jordan was brought to the hospital. Jordan was warm and not stiff. Cameron was not a medical doctor.

In her closing argument, the prosecutor presented several alternative theories of murder to the jury. She said it could find first degree murder by finding that Johnson picked Jordan up by one foot and then threw and punched him, as Belmonte testified. When Johnson picked Jordan up, he intended to kill Jordan and he had time to deliberate and reflect on what he was doing. "I would argue to you that why else do you throw and punch a 33-day-old baby," the prosecutor said.

Next, the prosecutor explained that the jury could find second degree murder in a number of different ways. It could find that Johnson intended to kill Jordan but did not premeditate and deliberate. It also could find that Johnson did not intend to kill Jordan—only to abuse or hurt him—but inflicted the blows with conscious disregard for his life. Or it could disbelieve Belmonte and find that she inflicted the beating, but could also find that Johnson, being Jordan's father and having a duty to protect him, failed in this duty and did so with conscious disregard for Jordan's life.

On the second count, assault on a child under eight resulting in death, the prosecutor told the jury it could find Johnson guilty if it found that Johnson inflicted the beating; that a reasonable person would think the beating was likely to produce great bodily injury; that Jordan died from it; and that Jordan was in Johnson's care and custody.

For the third count, child abuse, neglect or endangerment, the prosecutor focused on the burns and the failure to get them treated. If Jordan was in Johnson's care and custody and the circumstances were likely to cause great bodily injury, the jury could find Johnson guilty if it believed Johnson willfully or with criminal negligence caused the burns and failed to get treatment, or if it believed Belmonte inflicted the burns, and Johnson willfully or with criminal negligence failed to get treatment. The jury could find true the enhancement allegation for this count only if it found that Johnson personally inflicted the burns on Jordan.

The prosecutor also explained that the jury could find Johnson guilty of any of the first three counts under a theory that he aided and abetted Belmonte.

Defense counsel, in his closing argument, urged the jury to find Johnson not guilty of counts 1 and 2 and guilty of count 3, and to find the enhancement allegation on count 3 not true. His theory was that Belmonte inflicted both the beating and the burns as revenge against Johnson for Johnson's abuse of her and because of her animosity toward boys. When Belmonte was beating Jordan to death, Johnson was asleep. Johnson was

11.

guilty only of failing to get treatment for the burns. Defense counsel denied that the burns were proved to be a substantial factor in causing Jordan's death.

During its deliberations, the jury asked the court several questions in writing. One of these was: "Is 'knowledge of unlawful purpose' required prior to commission of an illegal act so far as aiding and abetting is concerned?" The court answered: "No. Aiding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself."

The jury returned a verdict as follows: on count 1, guilty of the lesser-included offense of second degree murder; on count 2, guilty; on count 3, guilty; on the enhancement on count 3 for personal infliction of great bodily injury, not true; on count 4, guilty.

After the verdict was announced, defense counsel spoke with a juror who had remained in the courthouse. Subsequently, counsel filed a petition for disclosure of juror identifying information, which he intended to use to develop or consider developing a motion for a new trial based on jury misconduct. The petition argued that the jury apparently violated the court's instructions and Johnson's rights by discussing the fact that Johnson did not testify. It was supported by counsel's declaration, which included the following paragraphs:

"e.    I asked the juror what he and his colleagues found significant during deliberations.

"f.    The juror told me the following:

"i)    Most of us thought he burned the baby, but thought it was an accident;

"ii)    You did not really argue the burn too much;

"iii)    There was some doubt regarding responsibility for the (assaultive injuries), but we figured he knew what was going on; and

12.

"iv)   *We didn't get to hear from him and we think that really might have helped.*"

The court denied the petition.  Johnson later filed a new trial motion based on the conversation described in counsel's declaration, and this also was denied.

The court imposed a sentence of 25 years to life on count 2, assault on a child resulting in death.  It imposed a consecutive sentence of six years on count 3, willful harm or injury to a child.  On count 1, second degree murder, the court imposed a sentence of 15 years to life and stayed it pursuant to section 654.  On count 4, resisting arrest, the court imposed a concurrent term of 30 days.

## DISCUSSION

### I.      *Motions for juror identifying information and new trial*

Johnson contends the trial court erred when it denied his petition for juror identifying information.  We review the court's denial of the petition for abuse of discretion.  (*People v. Jones* (1998) 17 Cal.4th 279, 317 (*Jones*).)

A trial court's records of jurors' identities are sealed following the recording of a verdict in a criminal case.  (Code Civ. Proc., § 237, subd. (a).)  "Any person" can obtain a hearing on the issue of securing access to the sealed records by submitting a petition and supporting declarations that "establish a prima facie showing of good cause for the release of" the information.  (*Id.*, subd. (b).)  A criminal defendant may file a petition pursuant to Code of Civil Procedure section 237 to enable the defendant to communicate with jurors "for the purpose of developing a motion for new trial or any other lawful purpose."  (Code Civ. Proc., § 206, subd. (g).)

The court must also consider whether there is a "compelling interest against disclosure."  (Code Civ. Proc., § 237, subd. (b).)  If there is not, and if a prima facie case of good cause has been shown, the court must set the matter for a hearing.  (*Ibid.*)  When a hearing is set, the court must notify the jurors, who have a right to protest disclosure and to appear at the hearing.  (*Id.*, subd. (c).)  After the hearing, the court must unseal the

13.

records unless it then finds a lack of good cause, finds a compelling interest against disclosure, or sustains a juror's protest. It must sustain a juror's protest if the juror says he or she is unwilling to be contacted. (*Id.,* subd. (d).)

Jurors commit misconduct if they violate a trial court's instructions not to discuss a defendant's failure to testify. (*People v. Loker* (2008) 44 Cal.4th 691, 749; *People v. Lavender* (2014) 60 Cal.4th 679, 686-687.) In this case, the court gave the jury standard instructions that if a defendant does not testify, "you must neither discuss this matter nor permit it to enter your deliberations in any way." If, during deliberations, one or more jurors does mention a defendant's failure to testify, a rebuttable presumption of prejudice arises. (*Lavender, supra*, at p. 687.)

Before the trial court ruled on Johnson's petition, it stated that, when the juror's remarks about Johnson not testifying were read "in context" with the juror's other remarks, it seemed the juror "was saying things might have been different if we had different information, but what we had was sufficient for guilt. He was not saying they … considered or gave any weight to [Johnson's] lack of testimony …." Next, the court pointed out that, to the extent the juror's remark related to his or other jurors' subjective thought processes, as opposed to their actual discussion, it was inadmissible under Evidence Code section 1150.[2] Finally, the court concluded that "counsel's declaration is too vague and conclusory to constitute the necessary prima facie showing of good cause" under Code of Civil Procedure section 237. It denied the petition.

---

[2]"Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).)

Johnson's contention is that his counsel's declaration clearly indicated that the jurors must have discussed his failure to testify and thus violated the court's instructions, since the juror who discussed the issue with counsel said "we" thought it would have helped had Johnson testified. We agree. The only question before the court at the time when it ruled on Johnson's petition was whether Johnson had made a prima facie case of good cause to release the jurors' information. (The issue of a compelling interest against disclosure was not raised.) He did so if he "prove[d] that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493 (*Johnson*).) The petition and accompanying declaration sufficiently showed this. The only reasonable inference from the juror's remark, assuming counsel's declaration reproduced it faithfully, is that at least two jurors discussed the fact that Johnson did not testify. This would constitute misconduct.

The People argue that the court did not exceed the limits of its discretion when it found that counsel's declaration was vague and conclusory and did not indicate that the jury gave weight to Johnson's lack of testimony. This argument overlooks the key point: The declaration necessarily implies that the juror who spoke to counsel discussed Johnson's failure to testify with at least one other juror. There is nothing vague about this. Further, as we will discuss in more detail below, Johnson was required at this preliminary stage to show only a prima facie case of misconduct; he was not yet required to show that the jury gave any particular weight to the improper matter or otherwise to show prejudice.

The People also contend that the juror's statement "suggested only that the jury felt no evidence meaningfully rebutted the People's case," and the jurors experienced "curiosity about evidence that existed that was not presented at trial"; thus, the declaration does "not suggest the jury expressly discussed [Johnson's] failure to testify." As we have already indicated, the declaration does not support this construction. That jurors discussed this matter is precisely what the declaration suggests.

15.

The People argue that the court could properly deny the petition because Johnson did not show that he made a diligent effort to contact jurors without the court's assistance. This argument is based on *People v. Rhodes* (1989) 212 Cal.App.3d 541 (*Rhodes*) and *Jones, supra,* 17 Cal.4th 279. *Rhodes* stated that a defendant seeking juror identifying information must establish that "diligent efforts were made to contact the jurors through other means" (*Rhodes, supra*, at p. 552); and in *Jones* our Supreme Court applied this requirement (*Jones, supra*, at p. 317).

We agree with the recent holding in *Johnson, supra*, 222 Cal.App.4th 486, that this requirement is no longer applicable. *Rhodes* was decided before Code of Civil Procedure section 237 was enacted. (*Johnson, supra*, at p. 496.) Similarly, *Jones* applied the nonstatutory rule of *Rhodes* only after noting that Code of Civil Procedure section 237 was not yet in effect at the relevant time. (*Jones, supra*, 17 Cal.4th at p. 317 ["Because the verdict was returned before Code of Civil Procedure 237 was enacted, we agree with the People that the substantive rule set forth in [*Rhodes*] applies."].)

In *Johnson*, the Court of Appeal explained that Code of Civil Procedure section 237, enacted in 1992, codifies the procedure for obtaining juror identifying information from a court and does not include a diligence requirement. Further, a 1995 amendment made mandatory the sealing of juror identifying information. (*Johnson, supra*, 222 Cal.App.4th at pp. 496-497.) To require defendants to make efforts to obtain the information from other sources before petitioning the court would be "forcing counsel to try to find ways around the seal" and to "try to track down the unwilling jurors." (*Id.* at p. 497.) "Because the Legislature provided that jurors' identifying information must be sealed, we conclude it did not intend to require a defendant to show diligent efforts to obtain the sealed information as a condition of unsealing it." (*Ibid.*)

The People next argue that the court had discretion to deny the petition because it was supported only by hearsay, i.e., by counsel's declaration describing the juror's statements. They rely on case law holding that, in the related context of a request for an

evidentiary hearing on the issue of alleged juror misconduct, a court does not abuse its discretion by denying the request on the ground that the allegation is based exclusively on hearsay. (*People v. Dykes* (2009) 46 Cal.4th 731, 810; *People v. Hayes* (1999) 21 Cal.4th 1211, 1256 (*Hayes*).)

The *Johnson* decision again effectively rebuts the People's position. The People there made the same argument they make here: A Code of Civil Procedure section 237 request for juror identifying information was properly denied because the declarations submitted in support of it contained only hearsay statements about what someone heard jurors say. Rejecting this, the Court of Appeal explained:

> "The whole point of moving for the disclosure of jurors' identifying information is to talk to the jurors; and the whole point of talking to the jurors is to obtain evidence of juror misconduct that will support a motion for new trial. The only people who can testify of their own personal knowledge about what happened in the jury room are the jurors themselves. Thus, it would be absurd to require a defendant seeking disclosure to introduce, at that preliminary stage, admissible evidence that juror misconduct actually occurred. Rather, the defendant simply has to prove that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*Johnson, supra*, 222 Cal.App.4th at p. 493.)

The *Johnson* court went on to compare a petition for juror information under Code of Civil Procedure section 237 to a motion to disclose a police officer's personnel records under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. A *Pitchess* motion can be based on a declaration made on information and belief (including a hearsay statement) because admissible evidence of the officer's misconduct would not normally be available to defense counsel at the point in the proceedings when the motion is made. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 86-89; *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1026.) A defendant is in a similar situation when seeking information

17.

with which to contact jurors in order to investigate apparent juror misconduct. (*Johnson, supra*, 222 Cal.App.4th at p. 493.)[3]

*Dykes* and *Hayes* are distinguishable. When a court is deciding whether to conduct a hearing on claimed juror misconduct, there either is no preliminary issue of gaining access to the jurors in the first place, or the proceedings have already progressed beyond that issue.

The People next argue that counsel's declaration in this case was not sufficient to support the petition because it concerned the juror's mental processes and therefore was inadmissible under Evidence Code section 1150. We disagree. The relevance of the juror's alleged remark was not that it said what the jurors thought, but that it implied what the jurors discussed. If the juror indeed said, "We didn't get to hear from him and we think that really might have helped [italics omitted]," he necessarily implied that he discussed Johnson's nontestimony with at least one other juror. This act would in itself be misconduct, regardless of what went on in the jurors' minds. Evidence Code section 1150 expressly permits otherwise-admissible evidence of "statements" made in the jury room if they are likely to have influenced the verdict improperly.

Finally, the People argue that the ruling should be affirmed because Johnson has not demonstrated prejudice. They say, "[A] trial court may deny a request for the disclosure of juror identifying information when prejudice cannot be established." The only authority the People offer for this proposition, however, is *People v. Loker, supra*, 44 Cal.4th at page 749. The citation is inapt. *Loker* concluded, on the cited page, that the trial court did not abuse its discretion when it denied a new trial motion because the

_____

[3]The *Johnson* court went on to hold that, in any event, declarations made by others about jurors' out-of-court statements are not hearsay because they are not offered for the truth of the matter they assert. Instead, they are "simply used to show good cause to contact the juror." (*Johnson, supra*, 222 Cal.App.4th at p. 493.) We need not address this additional holding.

misconduct illustrated by the jurors' declarations was not shown to be prejudicial. There is no discussion in the opinion of a petition for disclosure of juror identifying information.

The distinction between these two stages—a petition for juror identifying information and a new trial motion—is crucial. A court naturally has discretion to deny a new trial motion if the error alleged by the defendant did not prejudice the outcome. When making a petition for release of juror identifying information, by contrast, a defendant's burden is only to establish a prima facie case of good cause for disclosure, and this means a showing "that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*Johnson, supra*, 222 Cal.App.4th at p. 493.) It would be unreasonable to require a defendant to show prejudice at the stage when he is still seeking access to the witnesses on the basis of whose testimony prejudice might be established. We do not believe the Legislature had this unreasonable intention when it enacted Code of Civil Procedure section 237.[4]

We turn, finally, to Johnson's separate argument that the trial court erred when it denied his new trial motion. We review the trial court's decision on this motion for abuse of discretion as well. (*Hayes, supra*, 21 Cal.4th at pp. 1260-1261 ["A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion."].) Given the state of the evidence, the ruling was not an abuse of discretion. (*Ibid.* [new trial motion properly denied where evidence of juror misconduct was

---

[4]Johnson points out that the trial court did not issue a minute order describing the reasons for its denial of the Code of Civil Procedure section 237 petition. Such an order is required by statute. (Code Civ. Proc., § 237, subd. (b).) This procedural error is harmless because the court stated its reasons orally on the record; but in any event, the issue is moot in light of our holding that the court's ruling was substantively erroneous.

inadmissible hearsay].) Of course, the state of the evidence may be different if Johnson decides to file another new trial motion on remand.

We will remand the case to the trial court with directions to proceed in accordance with Code of Civil Procedure section 237. Counsel's declaration about his conversation with the juror establishes a prima facie case of good cause for the release of juror information, as we have said; and the court must determine whether there is a compelling interest against disclosure. The latter issue was not raised previously, but time has passed and the facts might have changed. If no compelling interest against disclosure is established, the court will be required to set a hearing, provide notice to the jurors, and follow all other statutory requirements. If the information is released and Johnson obtains additional evidence that would support a new trial motion, the trial court must permit Johnson to file such a motion.

## II.    *Jury's question about knowledge element of aiding and abetting*

Johnson argues that the court's answer to the jury's question about the knowledge element of aiding and abetting was erroneous as a matter of law. We disagree.

Aiding and abetting requires a defendant to know a direct perpetrator's purpose and to intend to encourage or assist. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) The jury was so instructed. It asked the court when the defendant's knowledge of the direct perpetrator's purpose must arise: must it be "prior to commission of an illegal act"?

Johnson argued to the trial court that the answer was yes. The prosecutor said the answer was no, since an aider and abettor's knowledge of the direct perpetrator's purpose can be acquired *during* the commission of the act. The prosecutor relied on *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733 (*Swanson-Birabent*) and *People v. Montoya* (1994) 7 Cal.4th 1027. The trial court agreed with the prosecutor. The answer it gave the jury, quoted above, was based on language from *Swanson-Birabent, supra,* at page 742.

20.

Johnson now argues that the language taken from *Swanson-Birabent* was either erroneous or misleading.  In effect, Johnson is arguing that the concept of knowledge of another's purpose, in the context of aiding and abetting, must necessarily mean advance knowledge—it makes no sense to speak of intentionally aiding a crime without knowing, until after the fact, that the perpetrator intended to commit it.[5]  This is incorrect for the reason the prosecutor stated.  An aider and abettor's knowledge of a direct perpetrator's purpose can arise at the same time as the criminal act, while the act is in progress, just as the court instructed.

*Swanson-Birabent* is directly on point and the reasoning and authority provided in the court's opinion in that case correctly dispose of the issue:

> "Contrary to defendant's assertion, advance knowledge is *not* a prerequisite for liability as an aider and abettor.  'Aiding and abetting may be committed "on the spur of the moment," that is, as instantaneously as the criminal act itself.  [Citation.]'  (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 532 ….)  In *People v. Cooper* (1991) 53 Cal.3d 1158 … (*Cooper*), the court held that 'a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during such asportation, may properly be found liable as an aider and abettor of the robbery.'  (*Id.* at p. 1161.)  The court reasoned that 'the commission of robbery continues so long as the loot is being carried away to a place of temporary safety.'  (*Id.* at p. 1170; see also *People v. Montoya*[, *supra*,] 7 Cal.4th 1027, 1039 … [upholding burglary conviction for aider and abettor who did not have knowledge of criminal purpose until after entry].)  [¶]  In *Cooper*, the court commented:  'The logic of viewing "committed" as a fixed point in time for purposes of guilt-establishment and "commission" as a temporal continuum for purposes of determining accomplice liability can be seen from the perspective of both the victim and the accomplice.  The rape victim, for example, would not agree that the crime was completed once the crime was initially committed (i.e., at the point of initial

---

[5]At one point in his opening brief, Johnson makes a different argument:  "[K]nowledge must precede *facilitation* of the crime in order for liability as an aider and abettor to attach …."  (Italics added.)  This may be correct, but it is not the issue the jury raised.  The jury's question can reasonably be understood to ask only whether a defendant's knowledge of a direct perpetrator's intent must arise before a direct perpetrator acts, not whether it must do so before a defendant facilitates.

21.

penetration). Rather, the offense does not end until all of the acts that constitute the rape have ceased. Furthermore, the unknowing defendant who happens on the scene of a rape after the rape has been initially *committed* and aids the perpetrator in the continuing criminal acts is an accomplice under this concept of "commission," because he formed his intent to facilitate the commission of the rape *during its commission*.' ([*People v. Cooper* (1991) 53 Cal.3d 1159, 1165, fn. 7].)" (*Swanson-Birabent, supra*, 114 Cal.App.4th at p. 742.)

In the contexts discussed in this passage—robbery, burglary, and rape—the offenses unfolded over time and the aiders and abettors gained knowledge of the direct perpetrators' intentions while the commission of the crimes was already in progress. In this case, the offenses at issue—murder, assault on a child resulting in death, and willful infliction of harm on a child—also unfolded over time. The prosecution was not required to prove that, if Johnson was guilty as an aider and abettor of Belmonte, he learned of Belmonte's intentions before she began to inflict harm. The court's answer to the jury's question was neither incorrect nor misleading.

Johnson argues that *Swanson-Birabent* misstates the law and misinterprets the cases on which it relies. We have reviewed those cases and do not agree with Johnson. Like *Swanson-Birabent*, the cases support the proposition that the knowledge element of aiding and abetting can be satisfied when an aider and abettor gains knowledge of a direct perpetrator's criminal intent during the commission of the crime, rather than prior to its commission. That proposition is supported by reason as well as by authority. As the *Swanson-Birabent* court explained, an accomplice's culpability is not erased by the fact that he or she encourages or assists in a crime after discovering it (along with its direct perpetrator's intent) already in progress, as opposed to knowing it would happen in advance.

### *DISPOSITION*

The judgment is affirmed subject to the following conditions: On remand, the trial court must permit the People to present any evidence of a compelling interest against disclosure of juror identifying information. If the People do not establish such an

22.

interest, the court must set aside its ruling denying Johnson's petition for disclosure of juror identifying information and must set a hearing in accordance with Code of Civil Procedure section 237. If, after the hearing, the court orders juror information released, Johnson must be permitted to file a new trial motion if he obtains evidence that would support such a motion.

_____

Smith, J.

WE CONCUR:


_____

Levy, Acting P.J.


_____

Peña, J.

23.