Filed 5/4/15  P. v. Navarette CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE NAVARRETE,<br><br>    Defendant and Appellant. | B253517<br><br>(Los Angeles County<br>Super. Ct. No. NA094149) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur Jean, Jr., Judge.  Affirmed.


William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Enrique Navarrete was convicted by a jury of assault with a semiautomatic firearm, with a gang enhancement.  He contends the evidence was insufficient to support the verdict; the trial court committed instructional and sentencing errors; and his sentence of 14 years amounts to cruel and unusual punishment under the state and federal Constitutions.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

a. *People's evidence*

In November of 2012, Shayla Paster lived in the Right Step Hotel (the hotel) located on Watson Avenue in Wilmington.  The hotel was situated in an area claimed as the territory of the East Side Wilmas criminal street gang, was a known East Side Wilmas gang hangout, and was used for the gang's drug sales.  Paster's boyfriend at the time, victim Paris Woodfin, repeatedly visited Paster at the hotel.  Woodfin was a former United States Marine.  Appellant Navarrete also lived at the hotel.  Paster and Navarrete had spoken "[a] couple of times," and he once helped her remove a cat from her window.  Woodfin had seen Navarrete at the hotel four or five times.[1]

(i) *The shooting*

In the early morning hours of November 18, 2012, Paster called and asked Woodfin for a ride home.  After picking her up in his black four-door Cadillac, they stopped at a fast food restaurant and continued on to the hotel, arriving at approximately 4:00 a.m.  Woodfin parked across the street and the couple sat in the car's front seat, talking and eating.  Two men, later identified as brothers Alejandro and Oswaldo Ballesteros,[2] whom Paster and Woodfin did not know, walked up the street and entered the hotel.  One of the men pounded his chest with his fists and yelled, "Ahhhh."

---

[1]    Woodfin testified at trial under a grant of immunity.

[2]    For ease of reference, we hereinafter sometimes refer to the Ballesteros brothers by their first names.

2

Woodfin, who was diabetic, began to have symptoms indicating his blood sugar was too high. He exited the driver's side and began searching for his small black insulin kit in the back seat area. Unable to immediately find it in the darkness, he sat in the back seat with his feet outside on the ground, and reached around backwards looking for it. Paster exited the front passenger seat and helped him search.

Just after Woodfin located the kit, and approximately six to eight minutes after the Ballesteros brothers had entered the hotel, Woodfin observed them exit the hotel with Navarrete. The men briefly headed north on Watson Avenue and then stopped and stood side by side on the sidewalk in front of the hotel, "lined up," looking at Woodfin.

Oswaldo asked Woodfin "Where are you from?" or similar words. Paster understood the question to mean "this is their territory." Alejandro said, " 'What do you have over there? It looks like you have something we want. What you got over there? What are you doing?' " Alejandro then displayed a silver gun. Oswaldo turned to his companions and said, " 'Come on. Let's go.' " Alejandro and Oswaldo started to walk across the street. Navarrete remained on the curb for "a couple of seconds" and then crossed with them directly towards Woodfin and Paster.

As the men approached, they spread out so that there were two to three feet between each man. Paster said, " 'Please don't do this. We are Christians. We don't gang bang.' " Oswaldo replied, " 'Well, we do.' " The men continued to approach until they were two feet or less from Woodfin's car. Oswaldo stood closest to and directly in front of Woodfin, approximately two feet away. Alejandro stood very close to the car, with the open driver's side rear door between him and Woodfin. Navarrete stood next to Alejandro. Alejandro displayed his gun again and charged a round, making sure Woodfin saw his actions.[3]

_____

[3] According to Woodfin, Alejandro put the loaded gun back in his pocket. According to Paster, Alejandro kept the gun out.

3

Paster began to cry. She said, " 'Please, don't shoot him. He is a diabetic.' " She approached and hugged one of the men.[4] The man she hugged said, " 'We are not talking to you. We want to talk to him' " and " 'We won't do anything. Don't trip, baby girl.' "

Woodfin, shocked and afraid for his and Paster's lives, felt the situation was "going downhill." Paster believed they were being "carjacked or robbed" and were "in fear of our lives." Woodfin decided he needed to take action to defend himself and Paster. Woodfin had a legally registered, Sig Sauer .40-caliber semiautomatic firearm on the floorboard behind the driver's seat. The gun contained a magazine, but did not have a round in the chamber. Woodfin reached for the gun. Oswaldo asked if Woodfin had a weapon. Woodfin put up his hands and said " 'No.' "

Woodfin determined that his only escape route was to exit the car, pass Oswaldo, and get to the sidewalk where he could chamber a round in the gun. He grabbed his Sig Sauer from the Cadillac's floorboard, stood up, pushed Oswaldo out of the way, took a step to the left, chambered a round, and moved onto the sidewalk. Woodfin pointed his gun at Oswaldo. Oswaldo stopped, put his hands up, and backed up. According to Paster, Alejandro then shot at Woodfin. Woodfin returned fire two to three seconds later, shooting three or four times as he ran from the assailants. According to Woodfin, he fired first at Alejandro, and Alejandro returned fire. Paster ducked and hid.

Woodfin felt a burning sensation and realized he had been shot in the hip. He headed southbound on Watson Avenue towards a gas station. Paster caught up with him and called 911.

Immediately after the shooting stopped, Paster saw Navarrete and the two Ballesteros brothers whispering together in the middle of the street. Then Navarrete, Oswaldo, and Alejandro headed northbound on Watson Avenue.

Woodfin was transported to a hospital. He had been shot once in the lower back. The wound caused nerve damage. A bullet remained lodged in his hip at the time of trial.

---

[4]     Paster testified that she hugged Alejandro, and may have hugged both men, whereas Woodfin testified that she hugged Oswaldo.

(ii) *The investigation*

Police recovered four spent casings of the same caliber and make as Woodfin's gun on the sidewalk on Watson Avenue. A spent .380-caliber casing, that was not fired from his gun, was found in the street in front of the hotel. A bullet fragment was found in a first floor storage room in the hotel. A trail of blood began on the west sidewalk approximately 100 feet north of the hotel.

Surveillance cameras recorded portions of the hotel's interior and exterior. The surveillance footage showed Navarrete and the Ballesteros brothers inside the hotel, then exiting through the hotel's front entrance just prior to the shooting.

Woodfin and Paster identified Oswaldo as the person who asked Woodfin where he was from, Alejandro as the shooter, and Navarrete as the third man.

(iii) *The gang expert's testimony*

Los Angeles Police Department Officer Mark Maldonado testified as a gang expert, as follows.[5] Navarrete was a member of the East Side Wilmas gang. He sported gang tattoos and used the moniker Bones. Alejandro and Oswaldo were also East Side Wilmas gang members who used the monikers "Little Sparky" and "Lil Lazy," respectively. The gang was predominantly Hispanic. It had approximately 450 members and claimed territory in Long Beach. The gang's primary activities included homicide and attempted homicide, robbery, grand theft auto, weapons possession, and narcotics sales. When given a hypothetical based on the evidence in the case, Maldonado opined that the assailants acted for the benefit of, and in association with, the East Side Wilmas gang. " 'Where [are] you from' is basically a precursor to violence." By acting together, gang members can more easily intimidate victims and "continue their hold in the neighborhood." The East Side Wilmas gang committed robberies to obtain money for the gang's use. In gang culture, respect is of the utmost importance. A gang member who

---

[5] The People presented additional evidence relevant to prove the Penal Code section 186.22, subdivision (b) gang enhancement. Because Navarrete does not challenge the sufficiency of the evidence to prove the enhancement, we do not further detail it here.

failed to support fellow gang members in a confrontation or attempted robbery would be perceived as weak and disrespectful, and would be punished, including possibly being beaten up for "not standing up with their gang." Navarrete showed support and intimidation by standing with his fellow gang members.

The statement, "it looks like you got something we want," in Maldonado's opinion showed that the speaker was about to rob the victim.

b. *Defense evidence.*

The defense attempted to show that Woodfin's trial testimony contradicted his statements to an officer who interviewed him at the hospital shortly after the shooting.[6]

Denise Avila lived at the hotel, and her husband was a friend of Navarrete's. She saw a woman, presumably Paster, standing next to an African-American man, presumably Woodfin. Paster repeatedly said, "He need[s] his insulin." Navarrete stood near Woodfin. Two Hispanic men were standing on the other side of the Cadillac. Woodfin then pulled out a gun and began shooting at Navarrete, who ran toward the gas station.[7]

---

[6] The defense elicited that in the hospital interview, Woodfin stated that he had been seated in the back of the Cadillac for approximately 20 minutes prior to the shooting; as the three assailants approached his car, one said, " 'You look like you got something I want' "; the shooter took his semiautomatic firearm from his waistband, not his pocket; and Woodfin did not state that he had shot from the sidewalk or that he had been looking for his insulin.

[7] During cross-examination and in rebuttal evidence, the People sought to show Avila had not provided some of this information to police when initially interviewed, and had become an uncooperative witness.

2. *Procedure.*

Trial was by jury.[8]  Navarrete was convicted of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)).[9]  The jury found the offense was committed for the benefit of, at the direction of, and/or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C).  The trial court sentenced Navarrete to a term of 14 years in prison.  It ordered Navarrete to pay victim restitution and imposed a restitution fine, a suspended parole restitution fine, a court operations assessment, and a criminal conviction assessment.  Navarrete appeals.

DISCUSSION

1. *The trial court did not have a sua sponte duty to instruct the jury on the definition of "semiautomatic firearm."*

The trial court gave CALJIC Nos. 9.02.1[10]  and 9.00[11] on the elements of assault with a firearm.  The standard version of CALJIC No. 9.02.1 defines "machine gun,"

---

[8]     Navarrete's trial was severed from the Ballesteros brothers'.  They are not parties to this appeal.

[9]     All further undesignated statutory references are to the Penal Code.

[10]     CALJIC No. 9.02.1, as given to the jury, provided:  "Defendant is accused of having violated section 245, subdivision (b) of the Penal Code, a crime.  [¶]  Every person who commits an assault upon the person of another with a semiautomatic firearm [is guilty of a] violation of Penal Code section 245, subdivision (b), a crime."

[11]     CALJIC No. 9.00 set forth the elements of assault, stating in pertinent part:  "In order to prove an assault, each of the following elements must be proved:  [¶]  1.  A person willfully and unlawfully committed an act which by its nature would probably and directly result in the application of physical force on another person;  [¶]  2.  The person committing the act was aware of facts that would lead a reasonable person to realize that as a direct, natural and probable result of this act that physical force would be applied to another person; and [¶]  3.  At the time the act was committed, the person committing the act had the present ability to apply physical force to the person of another."

7

"assault weapon," and ".50 BMG rifle," but does not define semiautomatic firearm.[12] CALCRIM No. 875, the successor instruction to CALJIC No. 9.02.1, does provide a definition of "semiautomatic pistol." Defense counsel did not request that the trial court give CALCRIM No. 875 in place of CALJIC No. 9.02.1, nor did counsel request that CALJIC No. 9.02.1 be modified to further define "semiautomatic firearm." Nonetheless, Navarrete argues the trial court had a sua sponte duty to provide such a definition, and its failure to do so violated his federal due process rights.[13] We disagree.

The People urge that Navarrete's claim has been forfeited because the failure to "request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.) Navarrete counters that the purported instructional deficiency implicates his substantial rights (§ 1259), and, if counsel's failure to object resulted in forfeiture, counsel provided ineffective assistance. Accordingly, we address the merits. (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7; *People v. Felix* (2008) 160 Cal.App.4th 849, 857-858.)

Whether a jury instruction is correct and adequate is a question of law, which we review de novo. (*People v. Jandres* (2014) 226 Cal.App.4th 340, 358.)

"A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel . . . ." (*People v. Lee, supra,* 51 Cal.4th at p. 638.) In the absence of a request for amplification, the language of a statute defining a crime is usually an appropriate and desirable basis for an instruction, as long as the jury would not have difficulty understanding the statute. (*People v. Santana* (2013)

---

[12] Navarrete was not charged with assault with a machine gun, assault weapon, or rifle, and the trial court properly deleted these definitions from the version of the instruction given to the jury.

[13] Navarrete also notes in passing that CALJIC No. 9.02 and CALCRIM No. 875 both define "firearm," and that neither instruction was given here. We do not understand Navarrete to argue that the trial court erred by omitting a general definition of "firearm," which is a commonplace and commonly understood term. (See generally *People v. Runnion* (1994) 30 Cal.App.4th 852, 858.)

56 Cal.4th 999, 1007; *People v. Estrada* (1995) 11 Cal.4th 568, 574; *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156.) " 'If a statutory word or phrase is commonly understood and is not used in a technical sense, the court need not give any sua sponte instruction as to its meaning.' " (*People v. Lucas* (2014) 60 Cal.4th 153, 296; *People v. Griffin* (2004) 33 Cal.4th 1015, 1022-1023.)  On the other hand, a court does have a duty to define terms that have a technical meaning peculiar to the law.  A word has a technical legal meaning requiring clarification when its definition differs from its nonlegal meaning.  (*People v. Cross* (2008) 45 Cal.4th 58, 68; *People v. Hudson* (2006) 38 Cal.4th 1002, 1012.)

Section 245, subdivision (b), provides:  "Any person who commits an assault upon the person of another with a semiautomatic firearm shall be punished by imprisonment in the state prison for three, six, or nine years."  Section 245 references other statutes defining machineguns, assault weapons, and BMG rifles, but does not reference or provide a definition of semiautomatic firearm.  At least on the facts of this case, the trial court's instruction with the statutory language was sufficient, and no technical definition of the term was necessary.  "Semiautomatic firearm" is not a novel concept.  To the contrary, it is a commonly understood term.  As we explain *post,* in the instant case there was no dispute that Alejandro's firearm was a semiautomatic.  Under these circumstances, the trial court had no sua sponte duty to provide a technical definition.

The fact CALCRIM No. 875, the successor instruction to CALJIC No. 9.02.1, includes a definition of "semiautomatic pistol" does not establish that the former CALJIC instruction was inadequate.  (*People v. Lucas, supra,* 60 Cal.4th at p. 294; *People v. Thomas* (2007) 150 Cal.App.4th 461, 465-466.)  "The Judicial Council's adoption of the CALCRIM instructions did not render any of the CALJIC instructions invalid or 'outdated,' . . . CALJIC instructions that were legally correct and adequate on December 31, 2005, did not become invalid statements of the law on January 1, 2006. Nor did their wording become inadequate to inform the jury of the relevant legal principles or too confusing to be understood by jurors.  The Judicial Council's adoption of the CALCRIM instructions simply meant they are now endorsed and viewed as

9

superior.  No statute, rule of court, or case mandates the use of CALCRIM instructions to the exclusion of other valid instructions." (*People v. Thomas, supra,* at pp. 465-466.)

Navarrete attempts to show that "semiautomatic firearm" does not have a commonly understood meaning.  He points out that CALCRIM No. 875 provides the following definition:  "A *semiautomatic pistol* extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger."  He argues that the dictionary definitions cited by the People are not precisely consistent with CALCRIM No. 875, or each other.  (Compare Merriam Webster Online Dict. <http://www.merriam-webster.com/dictionary/semiautomatic> [as of April 29, 2015] [a semiautomatic firearm is "able to fire repeatedly but require[es] release and another pressure of the trigger for each successive shot"] with Oxford Online Dict. <http://www.oxforddictionaries.com/us/definition/english/semiautomatic> [as of April 29, 2015] [a semiautomatic firearm has "a mechanism for self-loading but not for continuous firing"].)  He argues that the definition used by the California Supreme Court in *In re Jorge M.* (2000) 23 Cal.4th 866, 874, fn. 4 -- "A semiautomatic firearm 'fires once for each pull on the trigger and reloads automatically, but requires the shooter to release the trigger lever before another shot can be fired' "— was derived from a reference book that he characterizes as "obscure." Further, section 17140 provides, in regard to statutes not at issue here, the following definition:  "As used in Sections 16900 and 31910, 'semiautomatic pistol' means a pistol with an operating mode that uses the energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh cartridge with each single pull of the trigger."

Despite the foregoing, we are not convinced that the term has a technical legal meaning that differs from its commonplace, nonlegal meaning.  Nor do we think that jurors in the instant matter would have been puzzled about the definition.  But even assuming arguendo that the trial court erred by failing to sua sponte provide a technical definition, the omission was manifestly harmless under any standard.  (*Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  Woodfin unequivocally identified Alejandro's gun as a semiautomatic.  Woodfin had served in the

10

United States Marine Corps and Army, and had been trained in the use of firearms. He owned a semiautomatic handgun and knew the difference between a semiautomatic and a revolver. He explained that the loading mechanism he observed Alejandro use was the same as that in his own semiautomatic. This testimony was uncontroverted.

Further, the defense never contended that Alejandro's gun was something other than a semiautomatic. During closing argument, the prosecutor stated, "There was no real dispute that the gun involved was a semiautomatic gun." Defense counsel never challenged this statement, nor did she argue that Alejandro's gun was anything other than a semiautomatic. Indeed, when the prosecutor attempted to provide additional evidence regarding the defining characteristics of semiautomatic firearms, defense counsel objected. During Officer Tiffin's testimony, the prosecutor asked Tiffin to describe the difference between a semiautomatic handgun versus a revolver. Defense counsel objected that the question had been asked and answered, although only Woodfin, not Tiffin, had previously been asked the question. The trial court opined, "I think it has been pretty well established."

Navarrete contends Woodfin's testimony regarding the gun is "not controlling, because Woodfin identified the gun as semiautomatic on the basis that it had a slide, which is not part of any of the definitions of semiautomatic quoted by" the People. He complains that when the trial court asked Woodfin a series of questions regarding the gun, it too focused on the existence of the slide mechanism. But the fact Woodfin recognized the gun as a semiautomatic because its loading mechanism was consistent with the typical loading mechanism of a semiautomatic gun did not make his testimony less persuasive. Nor are we convinced by Navarrete's argument that "no one testified that the shooter was able to chamber a fresh cartridge with each pull of the trigger. If the jury had been properly instructed in that regard, at least one of the jurors might well have found that it was not proved that the shooter's gun was a semiautomatic firearm." Witnesses commonly identify objects without reference to their technical definitions. For example, a witness can identify a computer or a telephone without describing its inner workings. And witnesses typically testify to their observation of a firearm without

11

referencing the technical definition in CALCRIM No. 875 ("any device designed to be used as a weapon, from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion"). Where uncontroverted evidence supported an uncontested element, we cannot conceive how the omission of a technical definition of "semiautomatic" was prejudicial.

In sum, because the instruction was adequate, the trial court had no sua sponte duty to provide a further definition. Its omission did not affect Navarrete's substantial rights (§ 1259), and his contention has therefore been forfeited. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1347-1348.) Because there was no dispute that the gun was a semiautomatic, counsel did not provide ineffective assistance by failing to request its modification. (See *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 225.) Finally, even assuming arguendo omission of the instruction was error, it was manifestly harmless. (See generally *People v. Miranda* (2011) 199 Cal.App.4th 1403, 1422 [any error in failing to define " 'legal consent' " was harmless where the issue of the victim's capacity to give legal consent was undisputed].)

2. *The evidence was sufficient to support the verdict.*

Navarrete next contends the evidence was insufficient to support his conviction for assault with a firearm as an aider and abettor. We disagree.

a. *Applicable legal principles*

When determining whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Houston* (2012) 54 Cal.4th 1186, 1215.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998)

12

18 Cal.4th 297, 331.)  The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence.  (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

Section 245, subdivision (b), makes it a crime to commit "an assault upon the person of another with a semiautomatic firearm."  Assault is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  (§ 240.)  Thus, the elements of a violation of section 245, subdivision (b), are: (1) the defendant willfully committed an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; (2) he was aware of facts that would lead a reasonable person to realize that his act would directly and probably result in the application of force to someone; and (3) he had the present ability to apply force with a firearm.  (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1183, 1186-1187; *People v. Golde* (2008) 163 Cal.App.4th 101, 108-109; CALCRIM No. 875.)  Assault is a general intent crime, and does not require a specific intent to injure the victim.  (*People v. Wyatt* (2012) 55 Cal.4th 694, 702; *People v. Leonard* (2014) 228 Cal.App.4th 465, 486.)

Navarrete, who was not the actual shooter, was tried as an aider and abettor.  A person who aids and abets the commission of a crime is a principal in the crime.  (§ 31; *People v. Smith* (2014) 60 Cal.4th 603, 611; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117.)  An aider and abettor's "liability for criminal conduct is of two kinds.  First, an aider and abettor with the necessary mental state is guilty of the intended crime.  Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' "  (*People v. McCoy, supra,* at p. 1117; *People v. White* (2014) 230 Cal.App.4th 305, 317.)  Here, the People advanced both theories, and the jury was instructed on both.  (CALJIC No. 3.00 [principals defined]; CALJIC No. 3.01 [aiding and abetting defined]; CALJIC No. 3.02 [liability for natural and probable consequences].)

13

b. *The evidence was sufficient to prove Navarrete was liable as a direct aider and abettor.*

A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. (*People v. Smith, supra,* 60 Cal.4th at p. 611; *People v. Delgado* (2013) 56 Cal.4th 480, 486; *People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

Among the factors that may be taken into account when determining whether a defendant was an aider and abettor are presence at the crime scene, companionship, and conduct before and after the offense. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5; *People v. Medina, supra,* 46 Cal.4th at p. 924; *People v. Battle* (2011) 198 Cal.App.4th 50, 84-85.) Mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose, or the failure to prevent the crime do not amount to aiding and abetting, although these factors may be taken into account in determining criminal responsibility. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.) " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Juan G.*, at p. 5.)

Navarrete contends the evidence was insufficient because it showed nothing more than his presence at the crime scene. He urges that he did not say or do anything to aid and abet the assault, or to indicate his intent to do so; there was no showing he knew his fellow gang members had a gun or had planned a confrontation; and he did nothing more than "move from the curb to near the car when commanded to do so" by Oswaldo.

We disagree with this characterization of the evidence. Navarrete was not merely present at the scene; instead, he acted to facilitate the assault. Navarrete and the Ballesteros brothers were members of the same gang. The Ballesteros brothers passed Woodfin's car on their way in to the hotel. The hotel was in an area controlled by the

14

gang, and Woodfin was not a gang member.  It was near 4:00 a.m.  A few minutes later, the Ballesteros brothers emerged from the hotel together with Navarrete.  Almost immediately Oswaldo issued a gang challenge, asking "where are you from."  According to the gang expert, asking "where are you from" is a precursor to violence.  Navarrete and the two Ballesteros brothers "lined up" on the sidewalk, facing Woodfin.  Alejandro stated that Woodfin had something they wanted.  The gang expert testified these statements indicated an impending robbery.  Alejandro bolstered his threat by brandishing his firearm.  According to Paster, Alejandro held the gun aloft for at least 30 seconds.  Oswaldo said, " 'Come on.  Let's go,' " and the group crossed the street and approached Woodfin, who was still seated in the car.  Woodfin and Paster immediately understood what was transpiring:  Paster began to cry and pleaded with the men not to hurt them, explaining that they did not "gang bang."  In response, Oswaldo replied, " 'Well, we do.' "

The three assailants then stood in a row within one to three feet of where Woodfin was seated.  Alejandro, who was next to Navarrete, again displayed the gun, this time charging it.  According to Paster, the assailants, including Navarrete, were in "[p]oint blank range.  They were right up next to the car" and "were right there trying to box Mr. Woodfin."  She explained, "[t]hey were trying to . . . stop him from getting out of the car . . . ."  Woodfin testified:  "As I was sitting in my vehicle, I had three individuals come up to my vehicle.  They didn't leave me a way out.  They all crowded up against me.  My only way out was my rear passenger door, to get out of the vehicle, to defend myself and my friend."  Paster testified that after the shooting, Navarrete and the Ballesteros brothers whispered together in the middle of the street.

From the men's coordinated movements almost immediately after exiting the hotel, the jury could reasonably infer that the Ballesteros brothers observed Woodfin prior to entering the hotel; decided he was an easy target to rob, carjack, or attack, as a non-gang member in their territory; and went inside and recruited Navarrete to assist in the assault.  From this, the jury could have concluded Navarrete knew of, and shared, their intent to commit the assault.  The evidence was likewise sufficient to establish

15

Navarrete acted to facilitate the crime: he approached the car and stood with his fellow gang members, effectively boxing Woodfin in. The jury could readily infer Navarrete's presence served an important purpose, to intimidate and outnumber the victims, and encourage their compliance with whatever demands the group intended to make. The facts he did not say anything or physically accost the victim are not significant: "The 'act' required for aiding and abetting liability need not be a substantial factor in the offense. ' "Liability attaches to anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal." [Citation.]' [Citation.]" (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743; *People v. Garcia, supra,* 168 Cal.App.4th at p. 272.)

Even assuming the men did not plan the assault before exiting the hotel, the evidence was nonetheless sufficient. "[A]dvance knowledge is *not* a prerequisite for liability as an aider and abettor. 'Aiding and abetting may be committed "on the spur of the moment," that is, as instantaneously as the criminal act itself. [Citation.]' [Citation.]" (*People v. Swanson-Birabent, supra,* 114 Cal.App.4th at p. 742.) There can be no doubt that Navarrete fully understood what was transpiring early in the confrontation. As a gang member, he would have understood the significance of the gang challenge and the Ballesteros brothers' other statements. The jury could reasonably infer he observed Alejandro's gun while on the sidewalk, especially in light of Paster's tearful pleas not to hurt Woodfin. Thus, by the time Navarrete engaged in his coordinated actions with his fellow gang members, he had to have known both that they intended an assault and that Alejandro was armed with a gun. Yet Navarrete did not appear surprised by his compatriots' actions and did nothing to either dissuade them or disassociate himself from their conduct. Instead he approached the car with them, stood with them while Alejandro loaded his gun, and conferred with them after the shooting. This amounted to sufficient circumstantial evidence from which the jury reasonably could have found Navarrete knew of and shared the intent to assault Woodfin. (See *People v. Thomas* (2011) 52 Cal.4th 336, 355 [mental state and intent are rarely susceptible of direct proof and must be proven circumstantially]; *People v. White, supra,*

16

230 Cal.App.4th at p. 319.)  Indeed, it is difficult to conceive of any other possible intent behind Navarrete's actions, despite his silence.

The gang expert's testimony also supported the jury's findings.  Officer Maldonado testified that gang members maintain their hold on a neighborhood by intimidating victims, and make money for the gang by committing robberies.  A gang member is expected to back up his fellow gang members.  Maldonado explained:  "He is with his home boys.  And if he, hypothetically, wanted to not be there, he can't.  This is the life he ch[o]se.  He couldn't leave his home boys out to dry.  If they started walking toward the car and he walked away, they would see him as weak.  That would be a sign of disrespect. . . .  He shows support when standing there with [them].  He shows intimidation by standing with them.  And he can later on validate, yeah, home boys, they jacked that guy."  This testimony supported the conclusion that Navarrete intended to facilitate the assault, because it benefitted him and the gang.

*In re Juan G., supra,* 112 Cal.App.4th 1, is instructive.  There, Juan G. and Quincy D. approached the victim, Estevez.  Quincy spoke to the victim, pointed a knife at him, and demanded money.  Juan stood close enough to touch the victim, and the victim felt threatened by him.  When the victim complied, Quincy and Juan fled.  They were subsequently found by police walking through an empty lot.  (*Id.* at pp. 3-4.)  In his defense, Juan claimed he had not known Quincy had a knife or was planning to rob the victim.  (*Id.* at p. 4.)  The court sustained a juvenile petition against Juan alleging that he aided and abetted the robbery.  (*Ibid.*)  On appeal, the court rejected Juan's argument that he was nothing more than an unwitting and passive bystander.  (*Id.* at p. 5.)  The minors approached the victim together; when Quincy demanded money at knifepoint, Juan was beside him; the victim felt intimidated by Juan; and after the robbery the minors fled together.  (*Ibid.*; see also *People v. Hoang* (2006) 145 Cal.App.4th 264, 275-276; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094-1095.)  Navarrete's conduct in the instant case was similar.

Navarrete makes a variety of arguments in support of his insufficiency claim.  Among other things, he contends:  (1) it was "inconceivable" he would have participated

in the assault, because Paster and Woodfin could have identified him; (2) because he was not armed, he could not have provided effective backup for his fellow gang members; (3) the fact he hesitated at the curb before approaching the car, and acted only in response to Oswaldo's command, indicated reluctance rather than an intent to facilitate an assault; (4) the confrontation was not preplanned, because no evidence showed the Ballesteros brothers saw the victim in the Cadillac before entering the hotel, and it was too dark for them to have done so; (5) it would have been "foolhardy and personally dangerous" for Navarrete to attempt to stop the assault; (6) the evidence was contradictory regarding whether Alejandro said Woodfin had something "we" or "I" wanted, and the use of the pronoun "I" indicated Navarrete did not share Alejandro's intent or plan; and (7) there was no evidence he knew Alejandro had a gun before Alejandro displayed it. Apart from the question of whether these arguments are persuasive, they amount to a request that we reweigh the evidence on appeal. This is not the function of an appellate court. Navarrete's arguments "merely presented the jury with a credibility determination that is not reviewable on appeal." (*People v. Mejia* (2007) 155 Cal.App.4th 86, 99.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Nor does Navarrete's citation to *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, assist him. There Juan H., a juvenile, and his brother Merendon were Sureno gang associates. They lived in the same trailer park as Ramirez and Magdelano, who were Norteno associates. In the months prior to the shooting Juan had made gang gestures and tried to "stare down" Magdelano, and Magdelano had once punched Juan in the head. (*Id.* at p. 1278.) One night, an unknown person fired shots at Juan's family's trailer. Less that two hours later, Magdelano and Ramirez were walking through the trailer park when they saw Juan and Merendon run out of sight. Merendon reappeared shortly thereafter and approached the men. Juan followed and stood behind Merendon. When Ramirez denied that he and Magdelano were the shooters, Merendon pulled out a shotgun and killed him. Juan did not say anything, make any gestures, or otherwise encourage Merendon. Merendon fled and Juan returned to his trailer. (*Id.* at pp. 1266-1267.) The

18

California appellate court affirmed the juvenile court's finding that Juan committed first degree murder and attempted murder, and the California Supreme Court affirmed without opinion. (*Id.* at p. 1269.) The Ninth Circuit, however, reversed. It rejected the appellate court's conclusion that there was evidence of flight, motive, and false alibi. (*Id.* at pp. 1269, 1277-1278.) It further reasoned: "the record reflects no direct evidence that Juan H. had any idea that Merendon planned to assault or murder Magdelano and Ramirez. . . . [T]he circumstantial evidence presented does no more than establish that a rational trier of fact could conclude that Juan H. knew his brother was armed and ready to confront Magdelano and Ramirez if the family and home of Juan H. were again threatened. That Juan H. stood behind his older brother after the family home had been attacked, even if he knew his brother was armed, does not permit the rational inference that he knew his brother would, without provocation, assault or murder the victims. [¶] . . . Even if we were to assume the element of knowledge, the record does not reflect any evidence that Juan H. intended, through his actions, to assist Merendon in committing first-degree murder. Juan H. did not do or say anything before, during or after the shootings from which a reasonable factfinder could infer an intent or purpose to aid and abet in the murder of Ramirez and the attempted murder of Magdelano. Nor could any factfinder reasonably conclude that, by standing, unarmed, behind his brother, Juan H. provided 'backup,' in the sense of adding deadly force or protecting his brother in a deadly exchange." (*Id.* at pp. 1278-1279.)

*Juan H.* is distinguishable on its facts. Oswaldo's gang challenge, Alejandro's repeated display of his gun, and Paster's pleas in the instant case provided evidence from which Navarrete's jury could have concluded he was well aware of his compatriots' nefarious plans. Navarrete did not simply stand behind a relative; he coordinated his actions with the Ballesteros brothers in a fashion that intimidated and cornered the victim. Moreover, as our Supreme Court has observed, while lower federal court decisions on points of state law may be persuasive, they are not controlling. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 296.)

19

c. *The evidence was sufficient to prove liability under the natural and probable consequences doctrine.*

Alternatively, the evidence was sufficient to prove that Navarrete was guilty on a natural and probable consequences theory. Under that doctrine, an aider and abettor is guilty not only of the offense he or she intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he or she aids and abets. (*People v. Gonzales and Soliz, supra,* 52 Cal.4th at p. 296.)

"An aider and abettor under the natural and probable consequences doctrine . . . must know of and intend to assist the perpetrator's target crime (or must commit the target crime himself), *and* the nontarget crime must be a reasonably foreseeable consequence of that target crime." (*People v. Lisea* (2013) 213 Cal.App.4th 408, 415; *People v. Prettyman*, *supra*, 14 Cal.4th at p. 260.) " 'The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable.' " (*People v. Medina*, *supra*, 46 Cal.4th at p. 920.)

Here the jury was instructed on the target offense of displaying a firearm or deadly weapon in violation of section 417. Brandishing a weapon may be committed by drawing or exhibiting a weapon in a rude, angry, or threatening manner. (§ 417, subd. (a)(1); e.g., *People v. Sanders* (1995) 11 Cal.4th 475, 542; see also *People v. Booker* (2011) 51 Cal.4th 141, 189.)

As we have discussed *ante*, there was sufficient evidence to establish Navarrete knew Alejandro was armed and intended to aid and abet his confederates in confronting Woodfin because he was in their gang territory, to rob or carjack him, or both. For the same reasons, the evidence was sufficient to prove Navarrete was guilty as an aider and abettor of brandishing the firearm in violation of section 417.

Alejandro's act of firing the gun was a reasonably foreseeable consequence of the crime of brandishing the gun. The three gang members aggressively approached the victims at 4:00 a.m., cornering Woodfin in his car, after Oswaldo issued a gang challenge and Alejandro made statements indicating the men intended to rob Woodfin and made a

20

show of displaying and loading a weapon. It was entirely foreseeable that, in response to this clear threat, the victims would resist, and an armed victim would use a weapon in self-defense. It was not only foreseeable but almost a foregone conclusion that Alejandro would fire his gun in response. (See *People v. Lucas* (1997) 55 Cal.App.4th 721, 732-733; see generally *People v. Medina, supra,* 46 Cal.4th at p. 922.) The evidence was sufficient.

        3. *Sentencing issues*

        After considering the probation report and the arguments of counsel, the trial court sentenced Navarrete to the upper term of nine years for assault with a semiautomatic firearm, based on his "prior gang activity and his multiple convictions." It imposed an additional five years for the section 186.22, subdivision (b) gang enhancement.

        a. *The trial court did not abuse its discretion by sentencing Navarrete to the upper term.*

        Navarrete contends the trial court abused its discretion by selecting the upper term. We disagree.

        Section 1170, subdivision (b) provides in pertinent part: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . . The court shall select the term which, in the court's discretion, best serves the interests of justice." Thus, under current law, the middle term is no longer the presumptive term. (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1063.) "Sentencing courts have wide discretion in weighing aggravating and mitigating factors. [Citation.] Indeed, a trial court may 'minimize or even entirely disregard mitigating factors without stating its reasons.' [Citation.]" (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1258; see Cal. Rules of Court, rule 4.420(b).) " '[A] trial court is free to base an upper term sentence upon any aggravating circumstance that the court deems significant, subject to specific prohibitions. [Citations.] The court's discretion to identify aggravating circumstances is otherwise limited only by the requirement that they be "reasonably related to the decision

21

being made." ' " (*Weber,* at pp. 1063-1064.) A single aggravating factor will support an upper term sentence. (*People v. Osband* (1996) 13 Cal.4th 622, 728; *Weber,* at p. 1064.)

We review a trial court's sentencing choice for abuse of discretion and reverse only when there is a clear showing it is arbitrary or irrational. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; *People v. Ogg* (2013) 219 Cal.App.4th 173, 185.) A trial court abuses its discretion if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision. (*People v. Sandoval*, *supra,* at p. 847; *People v. Weber, supra,* 217 Cal.App.4th at pp. 1063-1064.) The burden is on the party attacking the sentence to clearly show the trial court's decision was an abuse of discretion. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978; *People v. Lai, supra,* 138 Cal.App.4th at p. 1258.)

The trial court did not abuse its discretion by finding Navarrete's criminal history was a factor in aggravation. (See Cal. Rules of Court, rule 4.421(b)(2).) Navarrete's probation report showed a 2008 conviction for being "a gang member in possession of a firearm," in violation of former section 12031, subdivision (a)(2). While the probation report is not entirely clear, it appears this offense was a felony. (See former § 12031, subd. (a)(2)(C).) On the same date, Navarrete suffered a misdemeanor conviction for entering a non-commercial dwelling. Navarrete suffered subsequent misdemeanor convictions in November 2008, February 2009, January 2010, and April 2010 for disobeying a court order. In each instance, Navarrete was placed on probation and, except for the November 2008 conviction, also ordered to serve brief periods in jail. The trial court could properly consider Navarrete's numerous prior convictions as an aggravating factor. (See Cal. Rules of Court, rule 4.421(b)(2); *People v. Stuart* (2008) 159 Cal.App.4th 312, 314 [six prior misdemeanor convictions were "plainly 'numerous' " and qualified as an aggravating circumstance]; *People v. Searle* (1989) 213 Cal.App.3d 1091, 1098 [three convictions for driving while intoxicated supported imposition of an aggravated term].) The record showed Navarrete was a recidivist who had suffered five misdemeanor convictions and one felony conviction in the brief period

of two years, and failed to successfully complete probation. This factor alone was sufficient to support imposition of the upper term.

Nor did the trial court abuse its discretion by weighing Navarrete's continued gang activity as a factor in aggravation. Navarrete contends his gang membership was not an aggravating factor because mere gang membership is not criminal. (See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 ["[m]ere active and knowing participation in a criminal street gang is not a crime"].) Navarrete also points to gang expert Maldonado's testimony that, during their numerous contacts over the years, Navarrete was cordial and respectful. He also avers that he has already been sufficiently punished for his gang involvement by virtue of the five-year section 186.22 gang enhancement. [14]

We discern no abuse of discretion. The record demonstrated more than mere gang membership. One of Navarrete's prior convictions was for being a gang member in possession of a firearm. At trial the gang expert testified regarding nine or 10 field identification cards documenting police contacts with Navarrete. Defense counsel successfully objected to admission of the cards, arguing, inter alia, that some included information on Navarrete's "alleged crimes" and "gang activity," and showed "other crimes being committed by Mr. Navarrete." In light of the foregoing, we cannot say the trial court's reliance on this factor was an abuse of discretion. (See Cal. Rules of Court, rule 4.420(b) [sentencing judge may consider any factor reasonably related to the sentencing decision].) Moreover, even absent this factor, the trial court's decision was supported by the aggravating circumstance of Navarrete's prior convictions.

Next, Navarrete argues that the trial court abused its discretion by failing to consider mitigating circumstances. The People aver that his contentions have been forfeited because they were not raised below. (See *People v. Brown* (2000)

_____

**14** Navarrete also points to the probation report, which reiterated his statement to the probation officer that he had not been an active gang member for nine years. The trial court was entitled to disregard this self-serving statement, which was in any event belied by Navarrete's participation in the instant crime.

23

83 Cal.App.4th 1037, 1041.)  In light of Navarrete's contention that his counsel provided ineffective assistance by failing to raise this contention below, we consider the merits.

According to Navarrete, the probation report and the trial court ignored the following purportedly mitigating circumstances:  (1) he was "a passive participant or played a minor role in the crime"; (2) he participated in the crime under circumstances of coercion or duress because, as a gang member, he could not "walk away" without placing himself in danger; (3) he was "induced by others" to participate, as evidenced by Oswaldo's statement, "Come on.  Let's go"; (4) he had an "insignificant" record; (5) he suffers from epilepsy; (6) he has two young children, for whom he was providing; and (7) he had obtained a certification from culinary school and was employed as a forklift operator at the time of the shooting.[15]

None of these arguments establishes an abuse of discretion by the trial court.  The fact Navarrete was employed, has a culinary school certification, and has young children are not mitigating circumstances.  To the contrary, they make his participation in the crime more troubling, in that he apparently had the opportunity to make an honest living and provide for his family but instead chose to participate in a serious, gang-related crime.  As discussed *ante,* Navarrete's record, while primarily comprised of misdemeanors, is not insignificant.  Navarrete cites no authority for the novel proposition that his choice to become a gang member, with the attendant dangers and violence, is a mitigating factor, and we do not view it as such.  The record is devoid of evidence that he

---

[15]     Navarrete also argues that at sentencing, the prosecutor erroneously stated the probation report recommended the upper term, whereas in fact it recommended a "mid-base" term.  He also faults the prosecutor and the probation report for stating that the victim was particularly vulnerable, a characterization he finds unpersuasive given that Woodfin, a former U.S. Marine, was armed.  In his view, the probation report incorrectly stated as circumstances in aggravation that the crime was carried out with planning, sophistication, or professionalism, and that his violent conduct indicated he was a danger to society.  But the trial court did not base its selection of the upper term on the prosecutor's statement, or upon these factors, and therefore they are irrelevant at this juncture.

acted under duress, was coerced, or was induced by others to aid and abet the crime, and his contrary contentions are speculative. That he may have hesitated on the curb for a few seconds before walking towards Woodfin with the Ballesteros brothers does not meaningfully demonstrate coercion. While it is unfortunate he suffers from epilepsy, this circumstance was unrelated to his crimes, and the trial court was not obliged to consider it as a mitigating factor. (See *People v. Kelley* (1997) 52 Cal.App.4th 568, 582.) Finally, as we have discussed, Navarrete's participation in the crime was significant. Navarrete, along with two other gang members, accosted Woodfin at 4:00 a.m. without provocation and provoked an armed confrontation. While Navarrete did not personally issue gang challenges or display a weapon, based on the evidence, the trial court was not obliged to characterize his conduct as passive.

b. *Navarrete's sentence of 14 years in prison does not amount to cruel or unusual punishment.*

Navarrete next complains his sentence of 14 years amounts to cruel and unusual punishment under the state and federal Constitutions because he "didn't do anything and he didn't say anything; he just stood there." We disagree.

The People correctly point out that because Navarrete failed to raise this claim below, he has forfeited it on appeal. (*People v. Russell* (2010) 187 Cal.App.4th 981, 993; *People v. Norman* (2003) 109 Cal.App.4th 221, 229-230; *People v. Em* (2009) 171 Cal.App.4th 964, 971, fn. 5.)

Even if not waived, the claim lacks merit.[16] Whether a punishment is cruel or unusual is a question of law, but we review the underlying facts in the light most favorable to the judgment. (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358; *People v. Em, supra,* 171 Cal.App.4th at p. 971.) A punishment for a term of years violates the federal Constitution only if it is "grossly disproportionate" to the severity of

---

[16] Because we conclude that Navarrete's sentence was not cruel or unusual punishment, his ineffective assistance of counsel claim, based on counsel's failure to raise this contention below, fails.

the crime.  (U.S. Const., 8th Amend.; *Graham v. Florida* (2010) 560 U.S. 48, 59-60; *People v. Carmony* (2005) 127 Cal.App.4th 1066, 1076.)  The Eighth Amendment does not require strict proportionality between crime and sentence.  (*Ewing v. California* (2003) 538 U.S. 11, 23; *People v. Johnson* (2010) 183 Cal.App.4th 253, 296; *People v. Carmony, supra,* at p. 1076.)

A punishment violates the California Constitution if, "although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted; *People v. Dillon* (1983) 34 Cal.3d 441, 478; *People v. Haller* (2009) 174 Cal.App.4th 1080, 1092.)  In making this determination, we (1) examine the nature of the offense and the offender; (2) compare the punishment with that prescribed for more serious crimes in California; and (3) compare the punishment with that given for the same offense in other jurisdictions.[17]  (*In re Lynch*, at pp. 425-427; *People v. Em*, *supra,* 171 Cal.App.4th at p. 972; *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.)  We consider the seriousness of the crime in the abstract and the totality of the circumstances surrounding its commission, including motive, manner of commission, the extent of the defendant's involvement, the consequences of his acts, and factors such as age, prior criminality, personal characteristics, and state of mind. (*Em*, at p. 972; *Dillon*, at p. 479; *People v. Felix* (2003) 108 Cal.App.4th 994, 1000.)  A defendant must overcome a considerable burden to show a sentence is disproportionate to his or her level of culpability, and findings of disproportionality have occurred " 'with exquisite rarity in the case law.' "  (*Em*, at p. 972.)

Navarrete has not met that burden here.  The crux of his argument is that his "involvement in the crime was minimal at best, and really nonexistent"; he did not have a gun or shoot the victim; he was not an "aggressive or even a truly willing participant in

---

**17**    Because Navarrete does not address the third prong of the *Lynch* analysis, we do not address it here.  (See *People v. Murray* (2012) 203 Cal.App.4th 277, 285, disapproved on another ground in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1387.)

26

the incident"; had he failed to join the Ballesteros brothers, he would have risked injury or death; he did not initiate the conduct with the victim or "in any way block or impede" him; and in essence, he is being punished for being a gang member. He suggests he is the real victim: he is "being punished for having been shot *at* by the victim . . . a six-foot three-inch former marine and army paratrooper with a particularly lethal handgun, while appellant was running away."

Navarrete's self-serving characterization of the record is unavailing. We review the underlying facts in the light most favorable to the judgment. (*People v. Mantanez, supra,* 98 Cal.App.4th at p. 358; *People v. Em, supra,* 171 Cal.App.4th at p. 971.) Nothing about the circumstances of the crime suggests the sentence was unconstitutional. Assault with a semiautomatic firearm is, indisputably, a serious crime. As we have discussed *ante,* there was ample evidence Navarrete was more than a mere passive bystander. The incident resulted in the shooting of one victim, who still suffered nerve damage at the time of trial, and the traumatization of the victim's companion. The motive for the crime was either mindless gang intimidation, or attempted robbery or carjacking, neither of which suggest the sentence is disproportionate. That Navarrete would have risked the gang's displeasure had he failed to act in concert with his fellow gang members does nothing to show his punishment is disproportionate. A defendant who chooses to join a criminal street gang, thereby intentionally placing himself in a situation where criminal activity is expected and violence is commonplace, cannot justify or mitigate his participation in a gang-related crime by complaining he had to do it or he would have been "disciplined" by the gang.

Navarrete also fails to demonstrate the punishment is disproportionate in light of his personal characteristics. He was 28 years old at the time of the offense, not an immature youth. A gang member, he had a criminal history and had failed to benefit from prior periods of probation. These facts do not lessen his individual culpability. In sum, the sentence is not disproportionate under either the state or federal Constitutions.

Navarrete also contends the penalty is grossly disproportionate when compared with punishment in California for other, more serious offenses. In support, he urges that

27

an assailant who "actually assaulted" a victim with a knife, inflicting great bodily injury, would receive a sentence of no more than eight years: the upper term of four years for the assault, plus one year for the use of a knife, and three years for the infliction of great bodily injury. (See §§ 245, subd. (a)(1), 12022, subd. (b)(1), 12022.7, subd. (a).) Navarrete fails to demonstrate the sentences are disproportionate. First, under California law, he was a principal in the crime; thus the fact he was not the actual shooter does little to assist him. Second, the posited knife attack would not constitute a more serious crime than the instant offense. The inherent danger to human life when a gun is the weapon of choice justifies harsher penalties. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 18.) Other, more serious crimes, such as murder, are punished more severely. (See § 190.) Third, Navarrete was sentenced to nine years for the assault. A one-year difference does not demonstrate disproportionality. The additional five-year term imposed on Navarrete was due to the section 186.22 gang enhancement.

In sum, Navarrete has forfeited his claim, and has in any event failed to demonstrate his sentence is cruel or unusual under either the state or federal Constitutions.

28

DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KITCHING, Acting P. J.

LAVIN , J.*

---

* Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.